Filed 10/25/22

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| K.M. et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>GROSSMONT UNION HIGH SCHOOL DISTRICT,<br><br>    Defendant and Respondent. | D075957<br><br><br>(Super. Ct. Nos. 37-2015-00004806-CU-PO-CTL, 37-2015-00031982-CU-PO-CTL, 37-2016-00006248-CU-PO-CTL) |
| K.M. et al.,<br><br>    Plaintiffs and Respondents,<br><br>    v.<br><br>GROSSMONT UNION HIGH SCHOOL DISTRICT,<br><br>    Defendant and Appellant. | D076833 |

APPEALS from a judgment and postjudgment orders of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge. Affirmed.

The Zalkin Law Firm, Irwin M. Zalkin and Devin M. Storey, for Plaintiffs and Appellants.

Artiano Shinoff, Paul V. Carelli IV, Gil Abed, and Daniel R. Shinoff, for Defendant and Appellant.

Leone & Alberts, Louis A. Leone and Seth L. Gordon for Northern California Regional Liability Excess Fund, Southern California Regional Liability Excess Fund, Statewide Association of Community Colleges, and School Association for Excess Risk as Amici Curiae on behalf of Defendant and Appellant.

INTRODUCTION

Plaintiffs K.M., H.R., and M.L. (Plaintiffs) sued the Grossmont Union High School District (the District) for negligence based on alleged sexual abuse by their high school drama teacher, James Chatham.[1] They also asserted sexual harassment claims under Civil Code section 51.9, to which the District successfully demurred. The District made Code of Civil Procedure section 998 offers, which Plaintiffs did not accept.[2] The case proceeded to a jury trial, where the trial court excluded certain evidence and mistakenly included Plaintiffs in an oral jury instruction regarding apportionment of fault. Plaintiffs prevailed, and the jury assigned 60 percent of fault to Chatham, and 40 percent to the District, with resulting damage awards lower than the section 998 offers. The parties moved to tax each

---

[1] Plaintiffs describe themselves by surname or as Roe plaintiffs. The District uses their names, noting they appear in the record. We recognize Plaintiffs' interest in privacy, but use first and last initials for clarity. We also abbreviate certain other names, and no disrespect is intended.

[2] Further statutory references are to the Code of Civil Procedure, unless otherwise noted.

2

other's costs. The trial court ruled the offers were invalid, granted Plaintiffs' motion, and denied the District's motion in pertinent part.

Both parties appealed. The Legislature later enacted Assembly Bill No. 218 (Assembly Bill 218 or Assem. Bill 218), which amended Code of Civil Procedure section 340.1, to reduce procedural barriers for childhood sexual abuse claims and to allow treble damages for a claim involving a prior cover-up of abuse.

Plaintiffs seek a new trial. They contend they are entitled to pursue treble damages, and that the trial court erred by sustaining the demurrers to their sexual harassment claims, excluding certain evidence, and giving the erroneous oral jury instruction. The District argues the trial court wrongly determined its Code of Civil Procedure section 998 offers were invalid. We conclude the treble damages provision in Code of Civil Procedure section 340.1 is neither retroactive, nor applicable to public school districts. We further conclude Plaintiffs do not establish they can pursue sexual harassment claims against the District under Civil Code section 51.9. The parties do not establish reversible error on the other asserted grounds, either. We affirm the judgment and postjudgment orders.

FACTUAL AND PROCEDURAL BACKGROUND

A.   *Underlying Events*

Plaintiffs attended Granite Hills High School ("Granite Hills") between 2009 and 2015. Chatham was the drama teacher until 2014. Georgette Torres was the school principal until 2013, and passed away in 2016. Jake Gaier and Michael Fowler served as assistant principals, with Fowler leaving for another school in 2011 and returning as principal in 2013.

3

The District had a policy prohibiting sexual harassment. There was also an online training program titled, "Making Right Choices" for staff and students, which addressed inappropriate conduct and reporting.

Former head custodian Sonia Villa received reports from custodians who saw Chatham with male students, and told her supervisor, Janie Wright, and teachers about these reports. Around 2010, she attended a meeting with Wright, Torres, and Fowler, at which Torres questioned why Villa was talking to teachers about other teachers and (according to Villa) required her to sign something.

In November 2011, a student's parents emailed Gaier to report inappropriate conduct by Chatham, including telling the students, "get up on stage we are filming a porno" and having a male visitor who would sit on his lap and whom he would ask to "kiss him."[3] Torres and Gaier held a meeting with Chatham, he agreed to stop, and they placed the email and meeting notes in his file as a written record. Gaier conducted a follow-up classroom visit, and did not hear further complaints or rumors about Chatham.

Between 2011 and 2014, Chatham engaged in sexual contact with each Plaintiff, which they described at trial and we address *post*.

In late January 2014, a female student and her mother told Granite Hill's resource officer, Robert Lesagonicz (Officer L.), that Chatham was sexually touching students. Fowler, who was now principal, placed Chatham on administrative leave. Officer L. conducted an investigation in which he interviewed the Plaintiffs and others. El Cajon Police Department detective David Vojtaskovic (Detective V.) also conducted an investigation. H.R.

---

[3] Other alleged conduct included telling a boy he looked like a porn star; telling a "boy to get behind [another boy] (sexually)"; and using terms like "dick, pussy, ass, porn, shit" and "that's what he/she said."

4

organized a meeting with K.M. and others in early February 2014 to discuss Chatham, at which they initially agreed to protect him; M.L. was not present. The District subsequently terminated Chatham's employment.

B.    *Litigation and Pretrial Proceedings*

In 2015 and 2016, each Plaintiff sued the District.  The operative complaints asserted claims for negligence; negligent supervision; negligent hiring or retention; negligent failure to warn, train, or educate students; intentional infliction of emotional distress; and sexual harassment under Civil Code section 51.9.[4]

The District demurred to the claims for sexual harassment under Civil Code section 51.9, arguing in part that it was not subject to liability.  The trial court consolidated the cases, including for purposes of the demurrers.  In June 2016, the court sustained the demurrers without leave to amend.

In May 2018, the District made the operative Civil Code section 998 offers, which Plaintiffs did not accept.

C.    *Trial*

The matter proceeded to a jury trial in November 2018 on Plaintiffs' negligence claims.  The jury heard extensive witness testimony, which we now summarize.[5]

---

[4]    Plaintiffs cited Government Code section 815.2 and 820 as the basis for their negligence claims.  H.R. also asserted claims under the Fair Employment and Housing Act, which the District represents were dismissed and are not at issue here.

[5]    We focus here on Plaintiffs' experiences with Chatham, the events in 2010 and 2011, and an overview of the psychiatric expert testimony.  We discuss other relevant testimony, *post*.

5

1. *Plaintiffs' Testimony*

K.M. took Chatham's class his sophomore year. Chatham engaged in improper conduct with male visitors, like having them sit on his lap. K.M. then did a summer theater program, in which Chatham did similar things, along with a "game" that involved almost kissing the boys. He started touching K.M., including nibbling on his ear, massaging his head and shoulders, and touching his stomach and thigh. K.M. said "it was a constant thing . . . so it became normal . . . ." During K.M.'s junior year, Chatham touched K.M.'s genitals over his pants and under his underwear, and kissed him. Chatham's behavior continued into his senior year, and K.M. eventually stopped interacting with him. During Officer L.'s investigation, K.M. initially denied doing anything with Chatham, stating he was worried if people would "think if [he] was gay" or "just a rat . . . ." He later described Chatham's conduct verbally for Officer L., but did not include in his written statement that Chatham touched his genitals. He also did not tell Detective V. about everything that happened, explaining he was "embarrassed" and "still struggling" with why he let it happen. K.M. was now serving in the military and married with a child.

H.R. took Chatham's class his junior year. H.R. first saw Chatham touch other boys, and Chatham then started touching him, including pulling him on his lap; nibbling his ears; rubbing his shoulders, chest, and legs; and doing the kissing game. H.R. said it felt "so normal," the students would mimic Chatham, and it was how they "joked around." Chatham later touched him under and over his underwear, and flicked his crotch. H.R. further testified his father had been difficult, his parents made him leave the home his senior year, and Chatham helped him get a job in community theater and work as his unpaid teaching assistant. H.R. said he avoided Officer L.'s calls

6

and organized the meeting to help Chatham, because Chatham "meant a lot" to him. He told Detective V. only about "minor things," to protect Chatham.

M.L. played multiple sports in high school, and excelled at football. He took a class with Chatham the first semester of his junior year. Chatham became "like a . . . close friend," started doing the kissing game, and one day groped his leg. M.L. said he was "weirded out," but thought it was a joke and did not report it. Chatham touched his legs repeatedly, felt "up [his] shirt," and groped and wrestled with him. Two weeks before Chatham was placed on leave, he touched M.L.'s genitals under his shorts. M.L. acknowledged he did not disclose the genital touching until early 2018, when he told Plaintiffs' expert psychiatrist, Dr. Calvin Colarusso. He said he did not tell Detective V. everything because he was embarrassed and did not want this to take away from his athletic success. After high school, M.L. attended Grossmont Community College, where he played football for a period of time.

2.    *Testimony Regarding 2010 Villa Meeting*

Former head custodian Sonia Villa testified about custodian reports about Chatham, and her meeting with school administration. She said she received multiple reports from a female custodian, including one time when Chatham and a male student were in his office with the lights off, and told her supervisor, Janie Wright, and a teacher. Villa said that another time, custodian William Kennedy reported a boy was laying on Chatham's leg on a sofa, and Chatham was touching the boy's hair. When Villa arrived, they were just sitting on the sofa. She told Wright, as well as another teacher, Joni Mah. Mah told her to tell an assistant principal, but Villa was concerned about "jump[ing] her supervisor" and getting fired.

Villa stated she was called into a meeting with Wright, Fowler, and Torres. According to Villa, Torres said she heard Villa was talking about

7

"Chatham doing inappropriate stuff" and asked, "why I don't come to her, why I came to a teacher and told her before her." Villa stated Torres had a "paper" ready, and said, "[F]rom now on, she don't want to hear that I talk about any teacher in any way, . . . and . . . I'm not allowed to say anything to anybody, to any teacher, . . . to my custodians and that this is what I have to sign the paper." She signed the paper because she "need[ed] the job." Villa then told the custodians they now had to "give [her complaints] in writ[ing]."

Mah, Kennedy, and Fowler also testified about these events.[6] Mah confirmed Villa talked to her about Kennedy's report, and said she talked to Fowler. Kennedy said he saw Chatham and the boy sitting side by side, with the lights down; Torres and Wright met with him and explained they were doing plays; and he denied they told him not to raise concerns. Fowler testified the Villa meeting was "about [Villa] complaining to teachers versus management." He denied Torres told Villa not to report inappropriate conduct by Chatham, or gave her anything to sign (although he testified at deposition that he did not remember any paperwork). Mah testified Villa subsequently said she was "told she shouldn't be talking to teachers about other teachers" and "had to sign something," and that Torres said she "talked to [Villa] about gossiping about teachers with other teachers."

3.    *Testimony Regarding 2011 Email*

Gaier testified about the 2011 email regarding Chatham, and the meeting and classroom visit that followed. He agreed that multiple actions violated the sexual harassment policy. He said he immediately told Torres, who concurred the behavior was inappropriate. During the meeting,

---

[6]    Kennedy's deposition testimony was read for the jury, as he was deceased by the time of trial. Torres was also deceased, and Wright did testify, but had no recollection of the events.

8

Chatham acknowledged certain behaviors, they took him at "his word" that it would stop, and put the documentation in his file. Gaier agreed Chatham "was not just given a stern warning; he was given discipline." Gaier said that when he visited Chatham's classroom, Chatham acted appropriately and he did not receive further complaints.

The student whose parents sent the email testified that after Gaier's classroom visit, Chatham told the class someone "ratted him out for being inappropriate."

Steven Sonnich, the District's associate administrator for human resources from around 2004 to 2016 (i.e., its chief personnel officer), was asked about the incident. He said placement of a document in Chatham's personnel file reflected it was a serious matter, and was "deemed serious by employees." He also said a visit could "send [a] message," if it carried the connotation that the teacher was "under a microscope," but had acknowledged at deposition that a single visit was not a strategy he would have used.

4. *Expert Witness Testimony*

Both sides offered psychiatric experts. Dr. Calvin Colarusso testified for Plaintiffs. He said each Plaintiff experienced child sexual abuse and post-traumatic stress disorder (PTSD), which could result from sexual abuse. He also determined K.M. had depression encompassed by his PTSD, H.R. had major depressive disorder, and M.L. had cannabis use disorder. Dr. Colarusso noted H.R. was diagnosed with depression previously and family issues contributed to it, but said the "sexual abuse exaggerated the depression." For M.L., he acknowledged other factors contributed to his trauma, but said there would be no PTSD without the sexual abuse.

Dr. Colarusso opined each Plaintiff needed years of therapy, now and in the future.

The District's psychiatric expert was Dr. Dominick Addario. He noted it was "very rare" for PTSD to develop in a situation not involving fear, and "most PTSD or stress-related issues from trauma take around 16 to 36 months to clear." He opined K.M. had heightened scores for anxiety and negativity, but would be in the same place without the experience with Chatham. He opined H.R. had major depressive disorder, noting his history of psychiatric and family issues, and 30 percent of his problems related to Chatham. As for M.L., Dr. Addario testified he had adjustment disorder with mild depressive features, and 15 percent of his issues were from Chatham.

D.   *Jury Instructions, Verdict, and Post-Trial Proceedings*

The trial court instructed the jury that Plaintiffs contended they were harmed by the District's negligence, and the District denied these allegations. In giving jury instruction 406 of the Judicial Council of California Civil Jury Instructions (CACI 406), regarding apportionment of fault among joint tortfeasors, the court mistakenly included "Plaintiffs." The trial court also told the jury there were two stipulations; that the District responded "appropriately and reasonably" to the 2014 report on Chatham, and that there were no prior student complaints besides the 2011 report.

In February 2019, the jury returned verdicts for Plaintiffs. The jury awarded damages of $480,000 to H.R.; $120,000 to K.M., and $135,000 to M.L. The jury apportioned 60 percent fault to Chatham and 40 percent fault to the District. With this apportionment, and application of Civil Code

10

section 1431.2, the District was required to pay damages of $240,000 to H.R., $60,000 to K.M., and $69,000 to M.L.[7]

Plaintiffs unsuccessfully moved for a new trial, asserting the trial court erroneously excluded certain evidence and included them in the CACI 406 instruction. In February 2019, the trial court entered judgment. The court then granted Plaintiffs' motion to tax costs, and denied the District's motion to tax costs in part, on the grounds that the District's section 998 offers were invalid.

Both parties timely appealed. We granted the application of the Northern California Regional Liability Excess Fund, Southern California Regional Liability Excess Fund, Statewide Association of Community Colleges, and School Association for Excess Risk to file an amicus curiae brief, and permitted the parties to file supplemental briefs to address the amicus brief and recent case law regarding section 340.1 treble damages.[8]

## DISCUSSION

### I.    *Plaintiffs' Appeal From Judgment*

Plaintiffs argue they are entitled to seek the newly-available treble damages, and that the trial court erred by sustaining the District's

---

[7]    Under Civil Code section 1431.2, "[i]n any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint." The damages here were awarded as follows:  H.R. ($80,000 economic, $400,000 non-economic); K.M. ($20,000 economic, $100,000 non-economic), and M.L. ($25,000 economic, $110,000 non-economic).

[8]    *Los Angeles Unified School District v. Superior Court* (2021) 64 Cal.App.5th 549 (review granted Sept. 1, 2021, S269608) (*LAUSD*) and *X.M. v. Superior Court* (2021) 68 Cal.App.5th 1014 (review granted Dec. 1, 2021, S271478) (*X.M.*).

demurrers to their sexual harassment claims, refusing admission of certain evidence, and including Plaintiffs in the CACI 406 instruction to their prejudice. We reject each argument.

A.      *Overview of Applicable Law*

      1.    *Statutory Interpretation*

In interpreting a statute, "we look first to the words of a statute, 'because they generally provide the most reliable indicator of legislative intent.' [Citation]. We give the words their usual and ordinary meaning [citation], while construing them in light of the statute as a whole and the statute's purpose." (*Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 530-531 (*Pineda*); see *Monterey Peninsula Water Management Dist. v. Pub. Utilities Com.* (2016) 62 Cal.4th 693, 699 (*Monterey*) ["statutory language cannot be read in isolation; like all language, statutory language takes its meaning from the context in which it appears"].) " 'If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs.' " (*Pineda*, at p. 530.)

"If the statutory terms are ambiguous, we may examine extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such circumstances, we choose the construction that comports most closely with the Legislature's apparent intent, endeavoring to promote rather than defeat the statute's general purpose, and avoiding a construction that would lead to absurd consequences." (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83.)

      2.    *Standard of Review*

When an appeal raises a pure issue of law, including as to statutory interpretation, we review the issue de novo. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432; *Pineda*, *supra*, 51 Cal.4th at

p. 529.)  Only prejudicial error is grounds for reversal.  (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 573-574 (*Soule*).)  The appellant has the burden to "show not only that the trial court erred, but also that the error was prejudicial . . . ."  (*Hoffman Street, LLC v. City of West Hollywood* (2009) 179 Cal.App.4th 754, 772.)  We address other applicable standards of review as necessary for particular issues.[9]

B.      *Treble Damages*

Plaintiffs contend they are entitled to a new trial to seek treble damages under Assembly Bill 218.  We conclude the treble damages provision is neither retroactive, nor applicable to public school districts.[10]

1.      *Section 340.1 and Assembly Bill 218*

"Section 340.1 governs the period within which a plaintiff must bring a tort claim based upon childhood sexual abuse."  (*Quarry v. Doe I* (2012) 53 Cal.4th 945, 952 (*Quarry*).)  After its enactment in 1986, the section was amended repeatedly to expand the statute of limitations and reduce other barriers to claims, including with a one-year claim revival period in 2002.

---

[9]      To the extent Plaintiffs cite statutes (e.g. Civ. Code, § 1708.5.5, Gov. Code, § 815.6), but provide no reasoned argument or separate headings, any points regarding them are deemed forfeited.  (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived."]; Cal. Rules of Court, rule 8.204(a)(1)(B) [briefs must "[s]tate each point under a separate heading or subheading summarizing the point"].)  Points raised by the parties for the first time on reply could also be deemed forfeited, but we elect to address them as we deem appropriate.  (*American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453 ["[p]oints raised for the first time in a reply brief will ordinarily not be considered"].)

[10]     We need not and do not reach the District's contention that retroactive treble damages would violate ex post facto principles.

13

(*Ibid.*)  Assembly Bill 218 further extended the statute of limitations, permitted up to treble damages for abuse resulting from a cover-up, and provided a three-year claim revival period.  (Assem. Bill 218, § 1.)

Section 340.1, subdivision (a), now permits an "action for recovery of damages suffered as a result of childhood sexual assault" to be brought within 22 years of the age of majority (i.e., age 40) or five years of when the plaintiff discovered the injury or should have.  (§ 340.1, subd. (a).)  Section 340.1, subdivisions (a)(1)-(3) describe the actions to which subdivision (a) applies.  (See § 340.1, subd. (a)(1) [person who commits act]; *id.*, subd. (a)(2) [person or entity with duty of care to plaintiff, where negligent act was a legal cause of assault]; *id.*, subd. (a)(3) [person or entity, where intentional act was a legal cause of assault].)

Section 340.1, subdivision (b)(1), the treble damages provision, states: "In an action described in subdivision (a), a person who is sexually assaulted and proves it was as the result of a cover up may recover up to treble damages against a defendant who is found to have covered up the sexual assault of a minor, unless prohibited by another law."  Section 340.1, subdivision (b)(2) states a " 'cover up' is a concerted effort to hide evidence relating to childhood sexual assault."

Section 340.1, subdivisions (q) and (r) address claim revival. Subdivision (q) states, "any claim for damages described in paragraphs (1) through (3), inclusive, of subdivision (a) that has not been litigated to finality and that would otherwise be barred as of January 1, 2020, because the applicable statute of limitations, claim presentation deadline, or any other time limit had expired, is revived, and these claims may be commenced within three years of January 1, 2020.  A plaintiff shall have the later of the three-year time period under this subdivision or the time period under

14

subdivision (a) as amended by [Assembly Bill 218]." Subdivision (r) states, "The changes made to the time period under subdivision (a) as amended by [Assembly Bill 218] apply to and revive any action commenced on or after [its] enactment . . . , and to any action filed before [its] enactment, and still pending . . . , including any action or causes of action that would have been barred by the laws in effect before the date of enactment."

Assembly Bill 218 also amended Government Code section 905, which imposes claim presentation requirements for local public entities, to retroactively expand the exemption for section 340.1 to all such claims. (Former Gov. Code, § 905, subd. (m) [exemption for Code Civ. Proc., § 340.1 claims "arising out of conduct occurring on or after January 1, 2009"]; Assem. Bill 218, § 1 [amending Gov. Code, § 905, subd. (m) to eliminate "on or after January 1, 2009," and add subd. (p)]; Gov. Code, § 905, subd. (p) ["The changes made to this section by the act that added this subdivision are retroactive"].)

### 2.    *Retroactivity*

Plaintiffs contend all of Assembly Bill 218's changes, including the new treble damages provision, apply retroactively. The District maintains this provision is a substantive change, and as there is no clear legislative intent for retroactive application, it applies prospectively. We conclude the treble damages provision operates prospectively only.

#### a.    *Applicable Law*

"[S]tatutes ordinarily are interpreted as operating prospectively in the absence of a clear indication of a contrary legislative intent," and there is a "presumption against retroactive application . . . ." (*Quarry, supra,* 53 Cal.4th at p. 955.) "We apply the presumption in the absence of explicit legislative indications of retroactivity, doing so based on the fundamental

15

fairness considerations raised by ' "imposing new burdens on persons after the fact." ' " (*McHugh v. Protective Life Ins. Co.* (2021) 12 Cal.5th 213, 229 (*McHugh*).)

" 'In deciding whether the application of a law is prospective or retroactive, we look to function, not form. . . . Does the law "change[ ] the legal consequences of past conduct by imposing new or different liabilities based upon such conduct[?]" [Citation.] Does it "substantially affect[ ] existing rights and obligations[?]" [Citation.] If so, then application to a trial of preenactment conduct is forbidden, absent an express legislative intent to permit such retroactive application. If not, then application to a trial of preenactment conduct is permitted, because the application is prospective.' " (*Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 231-232 (*Mervyn's*); accord, *McHugh, supra,* 12 Cal.5th at p. 229.)

We focus on "whether the statutory change in question *significantly* alters settled expectations. . . ." (*McHugh, supra,* 12 Cal.5th at p. 230; compare, e.g., *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1193-1194 (*Evangelatos*) [new liability under Proposition 51 applied prospectively], with *McHugh*, at pp. 231-232 [new insurance grace period and notice rules applied to existing actions; they made "relatively cabined, procedural changes" to policy administration, and did not "unfairly 'rewrite' existing policies"]; see also *Mervyn's, supra,* 39 Cal.4th at pp. 231-232 [impermissible retroactive rules included "subject[ing] tobacco sellers to tort liability for acts performed" when "protect[ed] [by] an immunity statute," while permissible prospective rules included eliminating right under anti-SLAPP to "dismiss certain public-interest lawsuits"].)

"Ambiguous statutory language will not suffice to dispel the presumption against retroactivity; rather ' "a statute that is ambiguous with

respect to retroactive application is construed . . . to be unambiguously prospective." ' " (*Quarry*, *supra*, 53 Cal.4th at p. 955.)

   b.   *Statutory Language*

Section 340.1 contains no language that supports retroactive treble damages. Subdivision (b), the treble damages provision, is silent as to timing. Subdivisions (q) and (r) revive claims based on conduct prior to enactment of Assembly Bill 218, but expressly reference *only* subdivision (a), not subdivision (b). (See § 340.1, subd. (q) [three-year revival period for non-final "claim for damages described in . . . subdivision (a)"]; *id.*, subd. (r) [changes to "time period under subdivision (a)" under Assembly Bill 218 apply to and revive non-final actions]; see also § 3 ["No part of [this code] is retroactive, unless expressly so declared."].)

Plaintiffs maintain that because section 340.1, subdivision (b) "refers back" to section 340.1 subdivision (a), and subdivision (r) makes actions under subdivision (a) retroactive, then subdivision (b) claims are "necessarily encompassed" in subdivision (a) and also retroactive. They further suggest that because Assembly Bill 218 added both subdivision (b) and the claim revival provisions, subdivision (b)'s "reference to 'subdivision (a)' was made with the understanding that [s]ubsections (q) and (r) revived any claims for damages falling within [s]ubsection (a)." (Italics omitted.) None of this is persuasive. If the Legislature intended section 340.1, subdivisions (q) and (r) to apply to subdivision (b), it could have *said so*, instead of relying on cross-references through subdivision (a). Regardless, Plaintiffs' reading of these provisions is at best a competing interpretation, which would render them ambiguous and insufficient for retroactive application of subdivision (b). (*Quarry*, *supra*, 53 Cal.4th at p. 955.)

17

### c. *Statutory Scheme*

Prospective application of the treble damages provision is also consistent with the statutory scheme. As described above, Assembly Bill 218 both reduced barriers to childhood sexual assault claims and added treble damages for assault resulting from a cover-up. The provisions aimed at reducing barriers either do not implicate improper retroactivity, or use express revival or retroactivity language. (See *Quarry, supra*, 53 Cal.4th at p. 956 [where "former limitations period has not expired, an enlarged limitations period ordinarily applies and is said to apply prospectively"]; Code Civ. Proc., § 340.1, subds. (q), (r) [express revival language]; Gov. Code, § 905, subd. (p) [express retroactivity language].) In contrast, the new treble damages provision imposed new and significant liability, and lacked any retroactivity language. (§ 340.1, subd. (b).) This change altered " ' "the legal consequences of past conduct by imposing new . . . liabilities," ' " and thus " 'application to a trial of preenactment conduct is forbidden.' " (*Mervyn's, supra*, 39 Cal.4th at pp. 231-232; accord, *McHugh, supra*, 12 Cal.5th at p. 229.)

Plaintiffs' arguments lack merit. First, they contend section 340.1, subdivision (a), "does not define covered actions by the specific type of damages sought, e.g., compensatory, treble, etc." This argument ignores both general tort principles, and the structure of section 340.1. Prior to Assembly Bill 218, subdivision (a) already applied to an "action for recovery of damages," and tort actions presumptively allow damages "for the purpose of compensating . . . ." (*Kizer v. County of San Mateo* (1991) 53 Cal.3d 139, 146-147 (*Kizer*).) Assembly Bill 218 added treble damages in a different subdivision—subdivision (b)—and, as explained above, the claims revival provisions referenced only subdivision (a).

18

Second, Plaintiffs contend an "analysis of whether [section 340.1, subdivision] (b) is retroactive is misplaced," as it "governs the remedy for an existing cause of action" and "does not create a *new* cause of action." Citing older authority, they state a statute is "procedural" when "it merely provides a new remedy," and "neither creates a new cause of action nor deprives defendant of any defense on the merits." (See, e.g., *Kuykendall v. State Bd. of Equalization* (1994) 22 Cal.App.4th 1194, 1211, fn. 20.) Under current law, it is " 'not significant whether the statute is labeled substantive or procedural in nature.' " (*Moore v. State Bd. of Control* (2003) 112 Cal.App.4th 371, 379; *Mervyn's*, *supra*, 39 Cal.4th at pp. 231-232 [we "look to function, not form"].) Nor is a new cause of action, or omission of a defense, necessary. (Cf. *ARA Living Centers-Pacific, Inc. v. Superior Court* (1993) 18 Cal.App.4th 1556, 1564 (*ARA Living*) [although amendment to elder abuse law "fell short of creating a cause of action," it did not "prescribe[ ] only procedures for trials"].) Rather, the issue is whether a law makes a significant change to potential liability. (*Mervyn's*, at pp. 231-232; accord, *McHugh*, *supra*, 12 Cal.5th at p. 230.) Assembly Bill 218's addition of treble damages does so.

We also reject Plaintiffs' reliance on attorney fees cases. Courts treat "legislation affecting the recovery of costs, including attorney fees, as addressing a 'procedural' matter that is 'prospective' in character and thus not at odds with the general presumption against retroactivity." (*USS-Posco Industries v. Case* (2016) 244 Cal.App.4th 197, 221.) The cases cited by Plaintiffs follow that approach, but do not involve damages and offer no guidance here. (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 930-932; *Olson v. Hickman* (1972) 25 Cal.App.3d 920, 922.) *ARA Living* did involve both fees and damages, and illustrates they remain distinct. (*ARA Living*, *supra*, 18 Cal.App.4th at p. 1562.) There, the Court of

19

Appeal held attorney fee changes applied to pending actions, but a new provision allowing successors (not just surviving victims) to recover pain and suffering damages applied prospectively only.  (*Id.* at pp. 1562-1564.)

More broadly, Plaintiffs contend the Legislature intended "to broaden the scope and application of [section] 340.1 to the widest possible extent, as it has consistently done over decades," noting Assembly Bill 218's retroactive change to Government Code section 905 as well.  There is no dispute that Assembly Bill 218, and prior amendments to section 340.1, aimed to reduce barriers to recovery for childhood sexual assault victims.  (See, e.g., *Coats v. New Haven Unified School Dist.* (2020) 46 Cal.App.5th 415, 430 and fn. 7 ["the Legislature has consistently worked to expand the ability of victims of childhood sexual abuse to seek compensation"]; *McVeigh v. Doe 1* (2006) 138 Cal.App.4th 898, 903-904 ["The overall goal of section 340.1 is to allow victims of childhood sexual abuse a longer time period in which to bring suit against their abusers."].)  But that overarching goal does not mean the Legislature intended one particular provision (here, adding treble damages) to apply retroactively.  (Cf. *Evangelatos*, *supra*, 44 Cal.3d at p. 1213 ["Most statutory changes are . . . intended to improve a preexisting situation and to bring about a fairer state of affairs, and if such an objective were itself sufficient to demonstrate a clear legislative intent to apply a statute retroactively, almost all statutory provisions . . . would apply retroactively rather than prospectively."].)

d. *Legislative History*

Finally, the legislative history for Assembly Bill 218 does not support retroactive application of the treble damages provision.

We begin with the parties' requests for judicial notice.  We take notice of the Assembly Bill 218 bill history, including interim versions and

20

committee reports and analyses, as well as fact sheets from the bill's author. (Evid. Code, § 452, subd. (c) [official records of Legislature are subject to judicial notice]; *Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 928 [taking judicial notice of bill author's fact sheet, where it "appear[ed] to be part of the debate on the legislation"].)  However, we will not take notice of letters *to* the Legislature, as they do not establish legislative intent.  (*In re Marriage of Pendleton & Fireman* (2000) 24 Cal.4th 39, 47, fn. 6 (*Pendleton*) [denying notice of letters to legislators, which opposed later-deleted bill text; it was "not apparent" letters were "considered by the Legislature when [the bill] was considered" and there was "no basis" to assume they "reflect legislative intent"]; see *Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 59, fn. 7 [denying judicial notice of irrelevant material].)  For similar reasons, we also deny notice of news and journal articles, and the bill author's press release.  (See *People v. Garcia* (2002) 28 Cal.4th 1166, 1175, fn. 5 [denying notice of "authoring legislator's press releases and letters"].)

We now turn to the bill history of Assembly Bill 218.  We focus on materials highlighted by Plaintiffs, and conclude they do not reflect clear legislative intent for retroactive treble damages.

First, Plaintiffs argue the "legislative history contains frequent references to the retroactive effect of the statute," citing an Assembly Committee on the Judiciary report.  (Assem. Comm. Jud., Mar. 12, 2019.)  The issue is whether the treble damages provision is retroactive, not the entire law, and the references they cite do not establish it is.

Plaintiffs state the report reflected numerous groups opposed the treble damages provision, and one insurance group objected "to the application of treble damages retroactively . . . ."  Input *to* the legislature does not reflect

21

legislative intent. (Cf. *Pendleton*, *supra*, 24 Cal.4th at p. 47, fn. 6.) Thus, we also accord no significance to the fact that, as Plaintiffs note, the "legislative history does not reflect any proposed amendment in response to this objection." Plaintiffs then focus on subsequent comments, which state "the flip side of the burden of the cost of these claims on [entities] that protected sexual abusers of children is the lifetime damage done to those children." The comments continue, stating in part that claim revival "only assures that claims can be heard on their merits." These comments do not constitute a "clear indication" that the treble damages provision is retroactive. (*Quarry*, *supra*, 53 Cal.4th at p. 955.) Plaintiffs also note the Assembly report states, "This measure applies retroactively to local public agencies" and "remov[es] the protections of the [Government Tort Claims Act] from local public entities." The "measure applies" statement is a heading for a section that addresses *only* changes to Government Code section 905. The "remov[es] . . . protections" language is from a subsequent section, under the heading "The bill also exposes those who cover up the sexual abuse of children to additional punishment"—which does address cover-up claims and treble damages, but *not* retroactivity.

Second, Plaintiffs argue the legislative history "confirms a retroactive intent," since "retroactivity was justified" by the harm from the assaults and the importance of deterring cover-ups. They cite an "According to the Author" section of an Assembly report, which in addressing treble damages, states in part that the "reform is clearly needed . . . ." (Assem. Bill 218, 3d reading, Jan. 16, 2019 (2019-2020 Reg. Sess.) p. 2.) We discuss this author statement *post*, in addressing whether the treble damages provision is punitive. Here, it suffices to say the statement does not support retroactivity.

22

Legislative recognition that a change is important does not mean it is retroactive, as we note above. (*Evangelatos*, *supra*, 44 Cal.3d at p. 1213.)

Finally, Plaintiffs argue "cover-ups were a major justification for retroactivity and revival," and we should not accept that statute portions "addressing cover-up were prospective only." They cite a Senate Rules Committee report, which states in part, "[T]he systematic incidence of childhood sexual assault . . . and the cover-ups that accompanied them arguably make both a revival period and an extended statute of limitations warranted." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill 218 (2019-2020 Reg. Sess.) as amended Aug. 30, 2019, p. 5.) We are not persuaded. Section 340.1 has been amended repeatedly to reduce barriers to claims, including a prior claim revival period. (*Quarry*, *supra*, 53 Cal.4th at p. 955.) As we discuss *post*, actual damages were and remain available for cover-up type allegations. To the extent cover-ups were part of the reason for further reducing such barriers in Assembly Bill 218, that is not an express statement that *treble damages* can be pursued retroactively.[11]

3.      *Impact of Government Code Section 818*

Treble damages are available under Code of Civil Procedure section 340.1, subdivision (b)(1), "unless prohibited by another law." (§ 340.1,

---

[11]      As Plaintiffs note elsewhere, a Senate Appropriations Committee report stated the fiscal impact would include "[u]nknown, potentially-major out-year costs . . . to the extent litigation is successfully brought outside the current statute of limitations and/or the districts are liable for treble damages." (Sen. Com. on Appropriations Rep. on Assem. Bill 218 (2019-2020 Reg. Sess.) Aug. 12, 2019.) At most, this reflects uncertainty about whether treble damages can be brought outside the statute of limitations, not retroactive intent.

subd. (b)(1).) We conclude Government Code section 818 precludes application of this provision to public school districts, joining our colleagues in other courts who have reached this conclusion.[12]

        a.     *Applicable Law*

"In tort actions, damages are normally awarded for the purpose of compensating the plaintiff for injury suffered . . . ." (*Kizer, supra*, 53 Cal.3d at pp. 146-147.) "When, however, the defendant's conduct is outrageous, additional damages may be awarded to punish the defendant and to deter such conduct in the future. [Citations.] Punitive or exemplary damages 'are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious . . . .' " (*Id.* at p. 147; see *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928, fn. 13 ["purpose of punitive damages is to punish wrongdoers and thereby deter . . . wrongful acts"]; Civ. Code, § 3294, subd. (a) [allowing punitive damages in non-contract cases where defendant is "guilty of oppression, fraud, or malice"].)

Government Code section 818, enacted as part of the Government Tort Claims Act (Gov. Code, § 810, et seq., sometimes "Tort Claims Act"), states: "Notwithstanding any other provision of law, a public entity is not liable for damages awarded under Section 3294 of the Civil Code or other damages

---

12    (*LAUSD, supra*, 64 Cal.App.5th at pp. 553-554, 567 [granting writ relief to public school district, where trial court denied motion to strike treble damages; holding § 340.1, subd. (b) "does not have a compensatory function"; its "primary purpose is to punish . . . cover ups to deter future ones"; and a "public entity . . . is immune from these enhanced damages under [Gov. Code, §] 818"]; *X.M., supra*, 68 Cal.App.5th at pp. 1019-1020 [denying student's writ petition from grant of motion to strike; purpose was punitive, not compensatory].)

imposed primarily for the sake of example and by way of punishing the defendant." (See *State Dept. of Corrections v. Workers' Comp. Appeals Bd.* (1971) 5 Cal.3d 885, 891 (*Dept. of Corrections*) [Gov. Code, § 818 refers to damages "designed to punish the defendant rather than to compensate the plaintiff"]; *Kizer, supra*, 53 Cal.3d at p. 146 [Gov. Code, § 818 "was not intended to proscribe all punitive sanctions," but to limit "exposure to . . . actual compensatory damages in tort cases"].)

        b.     *Statutory Language*

Section 340.1, subdivision (b)(1), states in pertinent part that a plaintiff who proves a childhood sexual assault "was . . . the result of a cover up" may "recover up to treble damages . . . unless prohibited by another law." It does not address the purpose of the treble damages.

Plaintiffs contend that "[b]y linking . . . treble damages to a showing of causation, the Legislature made clear that [they] are intended to compensate the victim of cover-up." The District argues the provision's plain meaning is that one may recover up to treble damages, unless "some other law" bars them; Government Code section 818 is "the other law"; and the provision "does not apply to public entities because [it] is meant to punish . . . ."

We conclude the statutory text supports the District's view that the treble damages provision is punitive, not compensatory, and Plaintiffs' focus on causation is misplaced. We further conclude the text reasonably encompasses Government Code section 818 as "another law," and bars treble damages against the District.

First, the text reflects a primarily punitive purpose. Section 340.1, subdivision (a), gives a plaintiff additional time to pursue a tort action for "damages suffered as a result of childhood sexual assault." This could include damages due to a plaintiff's awareness that the assault resulted from

25

a prior cover-up. Treble damages under subdivision (b), like punitive damages, are "by definition in addition to actual damages and beyond the equivalent of harm done." (*Dept. of Corrections*, *supra*, 5 Cal.3d at p. 891.) Further, as with punitive damages, a plaintiff must prove additional culpability by defendant (i.e., the prior cover-up), and the jury has discretion over whether and how much to award. (Cf. *Marron v. Superior Court* (2003) 108 Cal.App.4th 1049, 1059 ["In determining compensatory damages, '[a] jury's assessment of the extent of a plaintiff's injury is essentially a factual determination, whereas its imposition of punitive damages is an expression of its moral condemnation.' " (Italics omitted)].)

Plaintiffs' position lacks merit. Focusing on what they characterize as causation, they find it significant that only subsequent victims can seek treble damages, not one whose assault was covered up. In turn, they argue the conduct of a defendant that covers up assault "is exactly the same whether the abuser reoffends or not," and if treble damages were "intended solely to punish . . . , treble damages would be available whether or not the perpetrator re-offends." We disagree. The Legislature could reasonably distinguish between the culpability of Defendant A that covers up one assault, and Defendant B, whose cover-up results in further assaults. For example, Defendant A could take other measures to protect children, thus avoiding another assault, while Defendant B allows an environment to persist in which the perpetrator assaults others.

Second, the only reasonable interpretation of "unless prohibited by another law" is that it refers to laws that limit enhanced damages, like Government Code section 818. Although Government Code section 818 may not be the only such exception to the treble damages provision, it is *an* exception. Plaintiffs question whether "another law" refers to Government

26

Code section 818, noting the Legislature could have identified it by name, but they do not offer an alternative explanation for what law or laws it *does* refer to. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1118 [" ' "Courts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage." ' "].)

Plaintiffs maintain that even if the treble damages provision has "some punitive aspect," it remains compensatory and Government Code section 818 does not apply, citing the legislative history and case law from other contexts. We address and reject these arguments in turn.

        c.    *Legislative History*

Plaintiffs do not establish the legislative history reflects clear intent for treble damages to serve a compensatory purpose or to apply to public entities.

First, Plaintiffs cite a Senate Judiciary Committee report comment that states, in part, that "the victim's assault must result from a prior cover up of childhood sexual assault." (Sen. Com. on Judiciary, Rep. on Assem. Bill 218 (2019-2020 Reg. Sess.), Jul. 2, 2019, p. 11.) The report is silent as to the purpose of treble damages, and Plaintiffs' causation argument for a compensatory purpose lacks merit, as discussed above.

Second, Plaintiffs direct us to an excerpt from the bill author statement noted above:

> "[Assembly Bill] 218 would also confront the pervasive
> problem of cover ups in institutions, from schools to sports
> league[s], which result in continuing victimization and the
> sexual assault of additional children. The bill would allow
> for recovery of up to treble damages from the defendant
> who covered up sexual assault. This reform is clearly
> needed both to compensate victims who never should have
> been victims—and would not have been if past sexual
> assault had been properly brought to light—and also as an
> effective deterrent against individuals and entities who

27

> have chosen to protect the perpetrators of sexual assault over the victims."

The author statement does not establish a compensatory purpose. The statement does not identify the injury for which compensation is needed, and the language suggests a punitive motive. (*LAUSD*, *supra*, 64 Cal.App.5th at p. 560; see also Sen. Com. on Judiciary, Background Information Sheet for Assem. Bill 218, May 11, 2019 [bill would "increas[e] . . . damages a victim may recover from those who sought to cover up the abuse in order to deter bad actors"].) As noted, plaintiffs can already recover all of their actual damages. (See *X.M.*, *supra*, 68 Cal.App.5th at p. 1027 [no legislative history materials identified injuries that "treble damages are needed to compensate that actual damages do not already cover"].) And, even if the Legislature did intend treble damages to aid in compensation for cases involving cover-ups, it still does not follow that treble damages were not primarily punitive.

Third, Plaintiffs cite statements that purportedly show the Legislature intended to subject all defendants to treble damages. They start with a statement in an early Assembly report, repeated elsewhere, that "[t]his bill applies equally to abuse occurring at public and private schools and applies to all local public entities." (Assem. Bill 218, 3d reading, Jan. 16, 2019 (2019-2020 Reg. Sess.) p. 2.) Parts of Assembly Bill 218 apply to public entities, but that does not mean the treble damages provision does. Indeed, the Legislative Counsel's Digest in the enacted bill states the bill provides for "treble damages against *certain* defendants," and does not limit that qualification to defendants who engaged in prior cover-ups. (Italics added.) Plaintiffs also cite the Senate Appropriations Committee report comment, noted above, that there could be costs to school districts "to the extent litigation is successfully brought outside the current statute of limitations

28

and/or the districts are liable for treble damages." As we explained, this text reflects, at most, uncertainty as to public entity damages, not clear intent.

Plaintiffs make a related policy argument, contending "there is no basis in logic or law to impose a lesser standard on public schools . . . ." We question this characterization, as all schools remain liable for actual damages, and reject the point regardless. Courts have long recognized there is little justification for imposing enhanced damages on public entities, including public schools. (See *McAllister v. South Coast Air Quality Etc. Dist.* (1986) 183 Cal.App.3d 653, 660 [deterrence aspect of punitive damages has " 'little justification' " for public entities; "officials will do their duty," employees will be disciplined as needed, and employees would not be deterred by award against entity]; *Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1196, fn. 20 (*Wells*) [even if California False Claims Act's (CFCA) "treble-damage provisions are not strictly, or even primarily, 'punitive,' " the "purpose behind the statutory ban on punitive damages against public entities—to protect their tax-funded revenues from legal judgments in amounts beyond those strictly necessary to recompense the injured party—applies equally here"]; see *Visalia Unified School Dist. v. Superior Ct.* (2019) 43 Cal.App.5th 563, 570 [punitive damages against public entities " 'punish the very group' " they are " 'intended to benefit'—the taxpaying members of the general public."].)

Finally, Plaintiffs argue that even after the phrase "unless prohibited by another law" was added to section 340.1, subdivision (b), various groups and persons, including "public and private school officials," still requested the bill "be amended to eliminate . . . treble damages." They cite an Assembly report from March 2019, but other bill history materials reflect the language was added later. (See Assem. Bill 218 text, as amended in Senate on Aug. 30,

29

2019; Sen. Comm. on Appropriations, analysis of Assem. Bill 218 (2019-2020 Reg. Sess.) Aug. 30, 2019.) Regardless, the opposing groups' concerns were described in substantially similar terms in multiple reports over time, and there is no indication the description was reviewed when the "another law" language was added, such that we should ascribe significance to any lack of modification. Lastly, private groups would still have reason to oppose treble damages, after addition of language referencing Government Code section 818, and the views of outside entities do not reflect legislative intent, regardless. (Cf. *Pendleton*, *supra*, 24 Cal.4th at p. 47, fn. 6.)

> d.    *Case Law From Other Contexts*

Plaintiffs also rely on case law from other contexts to contend the treble damages provision is compensatory or otherwise is not subject to Government Code section 818, including civil penalties, workers' compensation, rent control, and federal statutes. None of these authorities convince us to reach a different conclusion.

First, Plaintiffs contend " 'the immunity . . . under section 818 is narrow, extending only to damages whose purpose is simply and solely punitive,' " citing a civil penalties case, *Los Angeles County Metropolitan Transp. Authority v. Superior Court* (2004) 123 Cal.App.4th 261, 275 (*LACMTA*), and two earlier civil penalty precedents, *People ex rel. Younger v. Superior Court* (1976) 16 Cal.3d 30 (*Younger*) and *Kizer*, *supra*, 53 Cal.3d 139. They also cite *Younger* and *Kizer* to contend "statutory schemes with obvious punitive elements are nonetheless permissible despite Government Code [section] 818 if they advance any legitimate non-punitive interest." Civil penalties entail different considerations than enhanced tort damages, and these cases are otherwise distinguishable.

In *Younger*, the California Supreme Court held Government Code section 818 did not immunize the Port of San Francisco from civil penalties for oil spills under the Water Code. (*Younger*, *supra*, 16 Cal.3d at pp. 34-35.) The Court held the penalties were not "simply and solely punitive in nature, but fulfill legitimate compensatory functions." (*Id.* at p. 39.) The Court explained much of the oil spill harm was "unquantifiable" and "cannot be recovered in an action for actual damage," and that collected sums were used for pollution abatement. (*Id.* at p. 39 and fn. 6.)

Then, in *Kizer*, the Court held civil penalties could be imposed on a county long-term care facility under the Health and Safety Code. (*Kizer*, *supra*, 53 Cal.3d at p. 141.) Focusing on the Tort Claims Act, the Court first held that nothing therein suggested Government Code section 818 "was intended to apply to statutory civil penalties designed to ensure compliance with a detailed regulatory scheme . . . even though they may have a punitive effect." (*Kizer,* at p. 146; *id.* at pp. 147-148 ["primary purpose" of penalties is "to secure obedience . . . to assure important public policy objectives"].) The Court also determined the statutory scheme did not "suggest[ ] . . . government health facilities should be treated differently than private facilities," and disagreed with the county that another statutory provision could provide a fully compensatory remedy. (*Id.* at pp. 148, 150.)

Lastly, in *LACMTA*, the Court of Appeal held a public transit authority was subject to a civil penalty under Civil Code section 52, subdivision (b)(2). (*LACMTA*, *supra*, 123 Cal.App.4th at p. 276.) The court noted "fundamental differences" between civil penalties and punitive damages, including that penalties are mandatory and do not require the plaintiff suffer actual damages. (*Ibid*.) The court also noted the penalty there "appear[ed] designed

31

to ensure that the plaintiff will receive at least a minimum amount of compensation," even with "little or no actual damages . . . ." (*Ibid.*)

These cases do not aid Plaintiffs. Plaintiffs seek enhanced damages in a tort action for childhood sexual assault, not application of civil penalties in a complex regulatory scheme. There is no need to provide minimum compensation or incentivize lawsuits, as assault damages are quantifiable (and may be considerable), plaintiffs are already entitled to receive such damages, and, indeed, Plaintiffs have done so here. (See, e.g., *J.P. v. Carlsbad Unified School District* (2014) 232 Cal.App.4th 323, 332 [district owed at least $1.8 million to plaintiffs, even after apportionment].)[13] As for the "simply and solely punitive" phrasing, we view that as a way of applying the "primarily punitive" requirement of Government Code section 818 in the civil penalties context—not a de facto elimination of the word "primarily." (See *Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1039 [" '[a]n interpretation that renders statutory language a nullity is obviously to be avoided.' "].)

Second, Plaintiffs contend a "strong analogy" can be made between the damage multiplier in *Department of Corrections*, a workers' compensation case, and the treble damages provision here. We disagree. There, the California Supreme Court held Government Code section 818 did not apply to a statute that increased a workers' compensation award by 50 percent for injuries resulting "from the serious and willful misconduct of the employer." (*Dept. of Corrections, supra,* 5 Cal.3d at pp. 887, 891.) The Court explained the purpose of ordinary workers' compensation "was not . . . to be full . . .

---

[13]    We deny the District's request for judicial notice of substantial damage awards in two recent cases, as they are not necessary to our analysis.

compensation," but, rather, to transfer "part of the [employee's] burden" to "the employer . . . ." (*Id.* at p. 889.) Thus, the "increased award [was] not a penalty in the sense of being designed primarily to punish the defendant rather than to more adequately compensate the plaintiff." (*Id.* at p. 890.) In contrast, any plaintiff suing for childhood sexual assault is entitled to recover actual damages, and enhanced damages are in *excess* of those actual damages. We reject Plaintiffs' claim that childhood sexual assault victims are not fully compensated, because respondeat superior limits employer liability, the employee is often judgment proof, and juries apportion some liability to the employee. A plaintiff's decision not to pursue recovery from the employee does not mean they are able to receive "only partial compensation."

Third, Plaintiffs contend courts have found treble damages multipliers are not always punitive, citing a rent control case, *Beeman v. Burling* (1990) 216 Cal.App.3d 1586, and two federal cases, *PacifiCare Health Sys., Inc. v. Book* (2003) 538 U.S. 401 (*Book*) and *Cook County v. United States ex rel Chandler* (2003) 538 U.S. 119. These cases do not help Plaintiffs, either. In *Beeman*, the Court of Appeal disagreed a rent control ordinance improperly required "*not less than three times actual damages*" for wrongful eviction. (*Beeman*, at p. 1597.) It distinguished statutory from punitive damages, explaining the former may take the form of penalties or a damages multiplier, but are "set by a legislative body," while the latter are "entrusted to the factfinder." (*Id.* at pp. 1597-1598.) Here, the treble damages provision *is* permissive and applied by the factfinder. As for *Book* and *Cook*, the United States Supreme Court recognized treble damages can have remedial goals, but in the context of complex federal laws that have no bearing on the California statutes before us. (*Book, supra*, 538 U.S. at pp. 405-406 [whether

33

arbitration agreement ban on punitive damages covered RICO treble damages was issue for arbitrator; noting treble damages were on a "spectrum" and those in RICO were "remedial in nature"]; *ibid.* [treble damages under Clayton Act (antitrust) were remedial]; *Cook, supra*, 538 U.S. at p. 130 [amendment authorizing treble damages in federal False Claims Act, while "essentially punitive," had "compensatory traits"].)

Finally, the District argues the enhanced damages provision in Civil Code section 52, subdivision (a), which applies to laws including the Unruh Act and permits up to treble damages, is analogous to Assembly Bill 218 treble damages and courts have held it to be punitive.[14] The District cites, inter alia, *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1171, superseded by statute on other grounds in *Munson v. Del Taco, Inc.* (2009) 46 Cal.4th 661 (*Munson*) and *Archibald v. County of San Bernardino* (C.D. Cal., May 10, 2018) 2018 WL 8849779. Plaintiffs dispute the relevance of these authorities. To the extent they offer guidance, they are consistent with our conclusion that Government Code section 818 precludes treble damages here. In *Harris*, the California Supreme Court held the Unruh Act did not prevent a landlord's minimum income policy, in part because the act barred only intentional gender discrimination. (*Harris*, at pp. 1148-1149.) The Court noted "the damages provision allowing for an exemplary award . . . reveals a desire to punish . . . ." (*Id.* at p. 1172.) In *Archibald*, a district court denied treble damages against a county under Civil Code section 52, subdivision (a), citing *Harris* and Government Code section 818. (*Archibald*,

---

14 See Civil Code, section 52, subd. (a) (defendant is "liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000).")

at *1-*2.)  The court explained other courts had relied on *Harris* to find these damages were punitive and "unavailable against a public entity," and observed they bore "some . . . hallmarks of punitive damages."  (*Id.* at *4; *ibid.* [noting *Harris* language was dicta, considering if there was a non-punitive purpose there, and concluding there was not].)  The treble damages here likewise are primarily intended to punish, resemble punitive damages, and lack a compensatory purpose.

4.    *Plaintiffs Do Not Establish Reversal Is Warranted*

Finally, Plaintiffs contend a retrial is warranted when a statutory amendment "requires a new finding of fact."  This argument rests on their position that they can pursue treble damages, which we have rejected.

C.    *Sexual Harassment Claim*

Plaintiffs contend the trial court erred by granting the District's demurrers to their sexual harassment claims, asserting the District is a "person" subject to Civil Code section 51.9 and they adequately stated a claim for relief under Civil Code sections 51.9 and 52.  We reject these arguments and conclude the trial court properly granted the demurrers.

1.    *Additional Facts*

As noted, each Plaintiff asserted a claim for sexual harassment under Civil Code section 51.9; the District demurred, including on the grounds that it was not subject to liability; and the trial court sustained the demurrers without leave to amend.

The trial court stated that under Civil Code section 51.9, "the term 'person' does not strictly apply to the individual perpetrator."  The court acknowledged *C.R. v. Tenet Healthcare Corp.* (2009) 169 Cal.App.4th 1094 (*Tenet*) held a private hospital employer could be liable under Civil Code section 51.9 for sexual harassment, but explained this did not apply to public

35

entities: "[T]he district cannot be held liable for the actions of a teacher because [Civil Code] section 51.9, as currently written, does not explicitly create liability for a public entity. . . . [W]ithout a statutory basis to hold the district directly liable for sexual harassment, the Government Claims Act immunizes the district." The court then addressed the public policy and cost implications of imposing vicarious liability for sexual misconduct by teachers, citing *John R. v. Oakland Unified School District* (1989) 48 Cal.3d 438 (*John R.*), and concluded it was persuaded government entities were not liable on that basis.

    2.    *Applicable Law*

Civil Code section 51.9 provides a cause of action for sexual harassment against a "person" who is in a "business, service, or professional relationship" with the plaintiff. (Civ. Code, § 51.9, subd. (a)(1).) The statute identifies a nonexclusive list of persons with whom a relationship may exist, including physicians, landlords, and teachers. (*Id.* at subd. (a)(1)(A)-(I).) Damages are "awarded as provided by subdivision (b) of [Civil Code] Section 52." (Civ. Code, § 51.9, subd. (b).)

Civil Code section 52, subdivision (b) states: "Whoever denies the right provided by [Civil Code] Section 51.7 or 51.9, or aids, incites, or conspires in that denial, is liable for each and every offense for the actual damages suffered by any person denied that right," as well as "exemplary damages," "attorney's fees as may be determined by the court," and, for Civil Code section 51.7, a civil penalty.

"We review a ruling sustaining a demurrer de novo, exercising independent judgment as to whether the complaint states a cause of action as a matter of law. [Citation.] 'We affirm the judgment if it is correct on any ground stated in the demurrer, regardless of the trial court's stated reasons.'

[Citation.] Further, ' "[i]f another proper ground for sustaining the demurrer exists, this court will still affirm the demurrer." ' " (*Abatti v. Imperial Irrigation District* (2020) 52 Cal.App.5th 236, 294 (*Abatti*).)

"When a demurrer is sustained without leave to amend, 'we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff.' " (*Abatti, supra*, 52 Cal.App.5th at pp. 294-295, citing *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

3.      *Whether Public Entity Is A "Person" Under Civil Code Section 51.9*

We begin with the central issue here: whether a public school district is a "person" under Civil Code section 51.9. We conclude that it is not.

a.      *Statutory Language*

Civil Code section 51.9 applies to a "person" in a professional relationship with the plaintiff. (Civ. Code, § 51.9, subd. (a)(1).) Although Civil Code section 14 states "the word person includes a corporation as well as a natural person," it does not state the word includes government entities. Plaintiffs maintain the District is a "public corporation," and thus a person for purposes of Civil Code sections 14 and 51.9. They further argue entities are subject to liability as persons under other authorities, and government liability is limited only when it infringes on sovereign power. These arguments lack merit.

First, Plaintiffs do not establish the District is a person under Civil Code section 14. "A public school district is a political subdivision of the State of California." (*Sheppard v. North Orange County Regional Occupational Program* (2010) 191 Cal.App.4th 289, 301; *Butt v. State of*

37

*California* (1992) 4 Cal.4th 668, 680-681 [" 'Local districts are the State's agents for local operation of the common school system' "].) To the extent a school district is characterized as a public corporation, the word "corporation" in that term does not mean it is a "corporation" within the meaning of Civil Code section 14, much less Civil Code section 51.9. (Cf. *Delano Farms Co. v. California Table Grape Com.* (2018) 4 Cal.5th 1204, 1238 ["Many such [public] corporations, such as school districts [citation], fulfill quintessentially governmental functions"].) Plaintiffs' reliance on the charter school holding in *Wells*, *supra*, 39 Cal.4th 1164, is misplaced. *Wells* did determine a charter school was a "person" subject to the CFCA, but held public school districts are *not* liable under that law. (*Id.* at p. 1200 [charter school was a "person" because CFCA statute did not exempt " 'corporations' organized under the Nonprofit Public Benefit Corporation Law" and certain other laws]; *id.* at p. 1179 [public school districts are not "persons" under the CFCA]; see also, e.g., *Gateway Community Charters v. Spiess* (2017) 9 Cal.App.5th 499, 507 [charter school, unlike public school district, was not "other municipal corporation" exempt from Labor Code provision at issue].)

Second, Plaintiffs rely on other inapposite authorities to argue for a broad interpretation of "person" under Civil Code section 51.9. *Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709 held noncorporate entities were persons for purposes of a medical reporting privilege in Civil Code section 43.8, noting in part that the term "including" in Civil Code section 14 was expansive. *Hassan* relied on *City of Pasadena v. Stimson* (1891) 91 Cal.238, 248, which held a statute permitting persons to acquire property for a sewer by condemnation applied to corporations. (*Stimson*, at pp. 245-246.) These cases involve dramatically different contexts and offer no guidance on the meaning of "person" here. (See *State ex rel Harris v.*

*PriceWaterhouseCoopers, LLP* (2006) 39 Cal.4th 1220, 1232 [rejecting reliance on *Stimson*, in companion case to *Wells*; "there are numerous indications in the language, structure, and history of the CFCA that the Legislature did not intend *this particular* statute to include public entities as 'persons' "]; *People v. Kareem A.* (2020) 46 Cal.App.5th 58, 70-75 [noting use of term "include" in Code of Civil Procedure section permitting imposition of sanctions, but relying on legislative purpose and history to conclude agency was subject to them].) Nor does the inclusion of "teacher" in the list of individuals subject to Civil Code section 51.9 compel a broad interpretation here. (Civ. Code, § 51.9, subd. (a)(1)(E).) Teachers may have private or public employers, and, regardless, imposing liability on a teacher does not pose the same concerns as imposing it on a public school district.

Third, Plaintiffs argue "person" should not be interpreted to exclude government entities unless liability would infringe their sovereign powers, citing *Flournoy v. State* (1962) 57 Cal.2d 497 and other older cases. But, as the California Supreme Court explained in *Wells*, "[T]he premise that public entities are statutory 'persons' unless their sovereign powers would be infringed is simply a maxim of statutory construction. While the 'sovereign powers' principle can help resolve an unclear legislative intent, it cannot override positive indicia of a contrary legislative intent." (*Wells*, *supra*, 39 Cal.4th at pp. 1192-1193 [both indicia of legislative intent and fiscal impact foreclosed public school liability under CFCA].) As we explain next, Plaintiffs do not establish Civil Code section 51.9 was intended to apply to public school districts, or that it would not impede their functions, and thus do not show the sovereign power principle should apply.

b. *Statutory Purpose*

Plaintiffs contend that imposing liability under Civil Code section 51.9 on public school districts would effectuate, not impede, their functions, which include preventing harassment. They relatedly contend liability would serve the state's interest in compensating victims and encourage them to come forward, and, otherwise, there is "no incentive to correct ongoing sexual harassment." These contentions lack merit.

First, there is no question that public school districts must provide a harassment-free environment for students. (See Ed. Code, § 220 [barring discrimination in schools receiving state funding]; *id.*, § 230 [prohibited practices include harassment on the basis of sex]; *id.*, § 231.5 [requiring "notification of the prohibition against sexual harassment" and "available remedies"]; *Donovan v. Poway Unified Sch. Dist.* (2008) 167 Cal.App.4th 567, 579 (*Donovan*) [addressing peer sexual orientation harassment claim under Ed. Code, § 220].) But statutory interpretation requires us to consider *this* statute's purpose. Plaintiffs do not establish Civil Code section 51.9 was intended to encourage school districts to curtail harassment, or necessary to do so. *Tenet*, which involved a private hospital, noted the enacting bill for Civil Code section 51.9 indicated its purpose was to expand liability in recognition that " 'sexual harassment occurs not only in the workplace, but in relationships between providers of professional services and their clients.' " (*Tenet*, *supra*, 169 Cal.App.4th at p. 1105 [discussing Sen. Bill 612; Stats. 1994, uncodified § 1]; cf. *Wells*, *supra*, 39 Cal.4th at p. 1191 [addressing CFCA; legislative history "suggests there was no intent to include school districts and other public and governmental agencies"].)

Further, there *are* other laws and legal theories besides Civil Code section 51.9 that encourage harassment victims to come forward, and let

them obtain compensation when they do, including the Education Code. (Ed. Code, §§ 220, 231.5; *Donovan*, *supra*, 167 Cal.App.4th at p. 579; see *C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861 (*C.A.*) ["public school district may be vicariously liable under [Gov. Code, §] 815.2 for the negligence of administrators or supervisors in hiring, supervising and retaining a school employee who sexually harasses and abuses a student"].)

Second, Plaintiffs also do not establish that applying Civil Code section 51.9 to public school districts would have no effect on their functioning. *Wells*, which addressed the fiscal impact of the CFCA, is instructive. (*Wells*, *supra*, 39 Cal.4th at p. 1193.) The Court explained, in part:

> "School districts must use the limited funds at their disposal to carry out the state's constitutionally mandated duty to provide a system of public education. . . . [¶] [T]here can be no doubt that public education is among the state's most basic sovereign powers. Laws that divert limited educational funds from this core function are an obvious interference with the effective exercise of that power."

(*Wells*, *supra*, 39 Cal.4th at p. 1195; *ibid.* ["The Legislature is aware of the stringent revenue, budget, and appropriations limitations affecting all agencies of government—and public school districts in particular"]; *id.* at pp. 1196-1197 [Legislature "did not intend to subject financially constrained school districts . . . to the treble-damages-plus-penalties provisions of the CFCA"].) For similar reasons, we will not presume the Legislature intended to subject public school districts to Civil Code section 51.9 by implication.

Plaintiffs' attempt to distinguish *Wells* is unpersuasive. They argue Civil Code section 51.9 imposes only actual damages and attorney fees (acknowledging exemplary damages under Civ. Code, § 52, subd. (b)(1) are limited by Gov. Code, § 818), whereas the CFCA has "draconian liabilities,"

41

including double or treble damages, civil penalties, and attorney fees and costs. They then reason that "[g]iven *Wells'* pronouncement that an obligation to pay damages does not infringe on sovereign powers," we should focus only on fees and "fees are already available against school districts in sexual harassment cases under Title IX and Section 1021.5." *Wells* recognized that "where liability *otherwise exists*, public entities must pay legal judgments," but did not state damages are not impactful. (*Wells*, *supra*, 39 Cal.4th at p. 1196, italics added.) And fees compound that impact, even if overall exposure is not as high as under the CFCA. Plaintiffs also contend the " ' "ultimate purpose of the [CFCA] is to protect the public fisc," ' " citing *Wells*, at page 1196. The California Supreme Court has recognized fiscal impact on schools as a concern in other contexts, as well, not just under the CFCA. (See, e.g., *John R.*, *supra*, 48 Cal.3d at p. 451 [addressing vicarious liability for teacher sexual misconduct].)

Finally, the District directed us in its briefing to *Brennon B. v. Superior Court* (2020) 57 Cal.App.5th 367, 369, which held the Unruh Act does not apply to public school districts. After briefing concluded, the California Supreme Court affirmed the Court of Appeal, holding in relevant part, "The statutory text of the [Unruh] Act, its purpose and history, and our prior caselaw all indicate that public schools, as governmental entities engaged in the provision of a free and public education, are not 'business establishments' within the meaning of the Act. (Civ. Code, § 51, subd. (b).)" (*Brennon B. v. Superior Court* (2022) 13 Cal.5th 662, 669 (*Brennon B.*).) The parties addressed the decision at oral argument, and Plaintiffs maintain it is not applicable here.

We conclude that although *Brennon B.* involves the Unruh Act, not section 51.9, the Court's analysis is instructive, and consistent with our

conclusion that Civil Code section 51.9 does not apply to public school districts.  Pertinent here, the Court noted the district's reliance on *Wells*, *supra*, 39 Cal.4th 1164, to argue that "subjecting public school districts to financial liabilities does not come without significant drawbacks and doing so could impede the ability of local governments (and the state) to provide free public education."  (*Brennon B.*, *supra*, 13 Cal.5th at p. 695; *id.* at p. 696 [citing *Wells*, at pp. 1195-1196 [legislature is "aware of stringent revenue, budget, and appropriations limitations" on public school districts].)  The Court also noted school districts "remain subject to other antidiscrimination laws."  (*Brennon B.* at p. 695.)  Significantly, the Court recognized "those laws may not afford the same remedies" as the Unruh Act, but " 'that circumstance cannot justify extending the scope of the [Unruh Act] further than its language reasonably will bear.' "  (*Id.* at pp. 695-696.)  Here, too, Civil Code section 51.9 does not extend to situations unsupported by the statute's text and purpose.

      4.     *Plaintiffs' Liability Theories*

Plaintiffs maintain the District's "liability is clear under three distinct avenues":  it is (1) "statutorily liable for its supervisory employees' failure to address and correct Chatham's sexual harassment," citing Government Code sections 815.2 and 820 and *C.A.*, *supra*, 53 Cal.4th 861; (2) "responsible for ratifying Chatham's misconduct," citing *Tenet*, *supra*, 169 Cal.App.4th 1094, and (3) "liable for its employees' actions in denying, or aiding, conspiring or inciting the denial of Plaintiffs' rights under section 51.9," citing Civil Code section 52 and asserting it "contains its own source of liability."

None of these arguments support the relief Plaintiffs seek to pursue— liability under Civil Code section 51.9 and attorney fees under section 52.

a.    *Vicarious Liability*

First, Plaintiffs contend Government Code sections 815.2 and 820 "impose[ ] upon public entities vicarious liability for the tortious acts and omissions of their administrative or supervisory personnel," citing *C.A.*, *supra*, 53 Cal.4th 861.  This argument does not support liability under Civil Code section 51.9 or remedies under Civil Code section 52.

Government Code section 815, part of the Tort Claims Act, "establishes that public entity tort liability is exclusively statutory." (*C.A.*, *supra*, 53 Cal.4th at p. 868.)  " '[T]he general rule is that an employee of a public entity is liable for his torts to the same extent as a private person ([Gov. Code,] § 820, subd. (a)) and the public entity is vicariously liable for any injury which its employee causes ([Gov. Code,] § 815.2, subd. (a)) to the same extent as a private employer ([Gov. Code,] § 815, subd. (b)).' " (*C.A.*, at p. 868.)

In *C.A.*, the plaintiff sued his public school district and guidance counselor based on alleged sexual harassment and abuse by the counselor, the Court of Appeal affirmed the district's dismissal following demurrer, and the California Supreme Court reversed.  (*C.A.*, *supra*, 53 Cal.4th at p. 865.)  The Court held allegations that the "administrators and employees knew or should have known of [the counselor's] dangerous propensities, but nevertheless hired, retained and failed to properly supervise her" could "make the District liable under a vicarious liability theory encompassed by [Government Code] section 815.2." (*Id.* at p. 875.)  But *C.A.* did not address Civil Code section 51.9, and does not support public school district liability under it.  (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 343 ["A decision, of course, does not stand for a proposition not considered by the court"].)  The Court also recognized diversion of school funds remained a valid concern.  (*C.A.*, at p. 878 [concerns over vicarious liability for teacher sexual

44

misconduct noted in *John R.*, *supra*, 48 Cal.3d at p. 451, including " 'the diversion of needed funds . . . to cover claims,' " were "still valid"].)  The other authorities cited by Plaintiffs do not address Civil Code section 51.9, either. (See *Nicole M. v. Martinez Unified Sch. Dist.* (N.D. Cal. 1997) 964 F.Supp. 1369, 1388-1389 (*Nicole M.*) [school administrators could be sued under Unruh Act for failing to remedy peer sexual harassment]; Ed. Code, §§ 220, 230.)

   b. *Ratification*

 Next, Plaintiffs contend "[p]rinciples of ratification apply to a [Civil Code] section 51.9 cause of action," citing *Tenet*, *supra*, 169 Cal.App.4th at page 1111.  They further contend these "principles also apply against public entities," citing *City of Los Angeles v. Superior Court* (1973) 33 Cal.App.3d 778, 782-783 (*City of Los Angeles*).  These contentions lack merit.

 Although *Tenet* did conclude plaintiffs could proceed on a ratification theory under Civil Code section 51.9, the case involved a *private* employer, as Plaintiffs impliedly acknowledge.  (*Tenet*, *supra*, 169 Cal.App.4th at p. 1097, 1099-1100 [reversing order sustaining private hospital's demurrer to putative class action without leave to amend, in action claiming sexual molestation by certified nursing assistant; hospital allegedly destroyed records to conceal abuse and hid information so employee could keep working].)  Thus, we also reject Plaintiffs' claim that the trial court lacked "any substantive explanation for failing to apply" the *Tenet* case.

 *City of Los Angeles* did involve a public entity defendant, but did not address Civil Code section 51.9 or ratification.  There, a city sought writ relief from a discovery order in a civil suit alleging police battery.  (*City of Los Angeles*, *supra*, 33 Cal.App.3d at pp. 780-782.)  The Court of Appeal denied relief in part, noting the city could be liable for "willfully continuing to

employ an individual of known violent propensities" and "negligent failure to adequately supervise its employees." (*Id.* at pp. 782-784.) At most, the case stands for the proposition that a plaintiff can pursue negligent retention and supervision theories against public entities. *Baptist v. Robinson* (2006) 143 Cal.App.4th 151, also cited by Plaintiffs here, did not involve Civil Code section 51.9 or a public entity, and is inapposite. (*Id.* at p. 169 [although "failure to discharge an employee who has committed misconduct may be evidence of ratification," winery did not ratify conduct of driver who injured motorcyclist while transporting grapes for his own use].)[15]

   c.   *Civil Code section 52*

Finally, Plaintiffs contend Civil Code section 52, subdivision (b) "contains its own source of liability for anyone who affirmatively 'denies', or who 'aids, incites, or conspires in' the denial of, rights attendant to sexual harassment." This contention lacks merit, too.

We begin with the statutory text, which states: "Whoever denies the right provided by [Civil Code] Section 51.7 or 51.9, or aids, incites, or conspires in that denial, is liable" for identified remedies. (Civ. Code, § 52, subd. (b).) Plaintiffs suggest the term "[w]hoever" is sufficient to impose liability, whether or not there is liability under Civil Code section 51.9. But we may not view statutory language "in isolation." (*Monterey*, *supra*, 62 Cal.4th at p. 699; *Pineda*, *supra*, 51 Cal.4th at pp. 530-531 [courts construe statutory text "in light of the statute as a whole"].) The statute's plain language requires predicate liability under Civil Code section 51.9 (or Civ. Code, § 51.7, if applicable).

---

15   Plaintiffs contend the trial court improperly decided the "factual issue" of ratification at the pleading stage. The court determined the District could not be liable as a matter of law.

Accordingly, the California Supreme Court has described Civil Code section 52 as an " 'enforcement mechanism for [Civil Code] section 51 and other provisions of law,' " and courts have interpreted these provisions consistently. (*Munson*, *supra*, 46 Cal.4th at pp. 667-668; cf., e.g., *id*. at p. 667 ["[Civil Code] section 51 has always provided substantive protection against invidious discrimination in public accommodations, without specifying remedies, and [Civil Code] section 52 has always provided remedies"]; *Stamps v. Superior Court* (2006) 136 Cal.App.4th 1441, 1452 [" 'the Ralph Act [Civ. Code, § 51.7] and the Unruh Act . . . share the same remedy statute, Civ. Code, § 52' "]; cf. *Doran v. North State Grocery, Inc.* (2006) 137 Cal.App.4th 484, 489 ["plain language" of Civ. Code, § 52, subd. (a) "makes clear that only those who deny rights guaranteed by [Civ. Code] section 51, 51.5, or 51.6 are liable for attorney fees"].)

Plaintiffs identify no California authority or legislative history that supports their view that Civil Code section 52 provides an independent source of liability. Their reliance on *Nicole M.*, *supra*, 964 F.Supp. 1369, is misplaced, both because we are not bound by lower federal courts (*Upshaw v. Superior Court* (2018) 22 Cal.App.5th 489, 503) and because the case is inapposite. There, the district court held a student could pursue claims for peer sexual harassment under the Unruh Act and Civil Code section 51.5 against a public school district, and the superintendent and principal, noting the term "[w]hoever" in the applicable section of Civil Code section 52 (subd. (a)). (*Nicole M.*, at pp. 1371-1372, 1388-1390; see *id*. at p. 1388 ["[B]ecause [Civ. Code, §] 52, subd. (a) allows plaintiffs to recover damages against '[w]hoever . . . makes any discrimination . . . contrary to [Civil Code] Section 51 or 51.5,' plaintiff may bring a claim against [the principal and superintendent] for violations of those sections."].) Setting aside the court's

47

determination that the school district was subject to the Unruh Act, (which *Brennon B.* has now made clear was incorrect), the *Nicole M.* court's point appeared to be that the plaintiff could recover from the individuals—not that Civil Code section 52 was its own source of liability.[16]  And even if Plaintiffs did pursue a claim under Civil Code section 52, subdivision (b) against the administrators for "aid[ing], incit[ing] or conspir[ing]" sexual harassment, they do not establish this would support liability against the District.  (Cf. *Munson*, *supra*, 46 Cal.4th at p. 671 [noting Court has read "denies, aids or incites" language in Civ. Code, § 52, subd. (a), as "connoting intentional discrimination"]; *John R.*, *supra*, 48 Cal.3d at p. 452.)

>        d.        *Ability To Amend*

Because the District is not liable under Civil Code section 51.9, and Plaintiffs have not shown they can recover against the District under Civil Code section 52, subdivision (b), they could not amend their complaints to permit relief under these statutes.  (*Abatti*, *supra*, 52 Cal.App.5th at p. 295.)

We observe Plaintiffs do not demonstrate prejudice, regardless.  They argue the "exclusion of sexual harassment claims" limited their ability to show Chatham "creat[ed] an inappropriate environment"; foreclosed a ratification theory that could have avoided allocation of fault; and prevented them from obtaining attorney fees.  Even if Plaintiffs could not pursue sexual

---

16    *Sullivan v. Vallejo City Unified School District* (E.D. Cal. 1990) 731 F.Supp. 947, also cited by Plaintiffs, is inapposite too.  (*Id.* at p. 952 [holding school districts are subject to Unruh Act, based on its legislative history; not addressing Civ. Code, §§ 51.9, 52].)  (Cf. *Brennon B.*, *supra*, 13 Cal.5th at p. 684 [disagreeing with *Sullivan*, and describing as unpersuasive the "body of cases that rely on [*Sullivan*] cursorily to conclude that public school districts are business establishments for purposes of the [Unruh] Act," including *Nicole M.*)

harassment claims under Civil Code section 51.9, they were still able to offer evidence that Chatham regularly acted in an inappropriate, sexualized manner, and prevailed on negligence claims based on this conduct. Second, on ratification, Plaintiffs argue "[a]llocation of noneconomic damages is not available in vicarious liability situations," citing a vicarious liability case, *Wimberly v. Derby Cycle Corp.* (1997) 56 Cal.App.4th 618, 629-631. They do not establish ratification is unavailable outside the Civil Code section 51.9 context, or that ratification is equivalent to vicarious liability for allocation purposes. Finally, as for fees, Plaintiffs could have named Chatham as a defendant, enabling them to pursue both Civil Code section 51.9 claims, and the related attorney fees.

D.     *Plaintiffs Do Not Establish Evidentiary Error*

Plaintiffs assert the trial court erred by limiting evidence regarding Chatham's friendship with Torres and his internet bookmarks, and by purportedly excluding testimony by a therapist and football coach. They do not establish any prejudicial abuse of discretion.

1.     *Applicable Law*

" 'A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 446-447.) It is the appellant's " 'burden to establish such an abuse, which we will find only if the trial court's order exceeds the bounds of reason.' " (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 852.) An " 'erroneous evidentiary ruling requires reversal only if "there is a reasonable probability that a result more favorable to the appealing party would have been reached in the

49

absence of the error." ' " (*Id.* at p. 857; *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 (*Cassim*) [probability here means " 'a reasonable chance, more than an abstract possibility' "].)

2.    *Friendship Between Chatham and Torres*

a.    *Additional Facts*

During depositions, Plaintiffs' counsel asked about Chatham's relationship with Torres. Chatham himself said Torres was a good friend, they would eat together, and she would watch his local theater performances. Librarian Lynn Kraszewski said Chatham and Torres "had a friendship," and noted one time that she, Chatham, and Torres visited Chatham's new apartment and then had dinner at Torres's home. Teacher Merryl Nelson said Chatham and Torres were "collegial," and when asked if he had Torres's ear, she said "I felt he did . . . in relation to a few instances . . . that had to do with me." Teacher Joni Mah said Torres "liked" Chatham, but would not "call it a close relationship" and was not aware of any special treatment, while a campus supervisor assumed they were friends, because they "talk[ed] a lot."

The District moved in limine to exclude testimony that Chatham and Torres were friends, as irrelevant, speculative, and confusing. Plaintiffs opposed, citing the deposition testimony and Facebook messages from before Torres died in 2016, in which Chatham proposed getting brunch and said, "I miss you tons," and Torres replied, "That sounds like a great idea! . . . Miss you, too!" At the motion hearing, Plaintiffs' counsel argued Sonnich, the former head of human resources, would testify personnel were supposed to report, not investigate, because friendships were common and this evidence would show Chatham and Torres had one. The trial court tentatively excluded the evidence, stating they would see "how [Sonnich] testifies" and

50

"let the evidence flow." The court also granted Plaintiffs' motion to exclude evidence of Torres's character.

During trial, Plaintiffs' counsel again sought to introduce relationship evidence, contending the District was suggesting in witness examination that the school would never "not respond . . . appropriate[ly]" to complaints, in part due to Torres's character. The trial court denied the request, but told counsel, "You will probably be given a little leeway . . . when you have [Chatham] on the stand and you talk to him about his relationship with [Torres]." Chatham did not testify at trial.

Sonnich subsequently testified administrators were supposed to report, not investigate, due in part to the collegiality of the environment and the desire for a uniform process. Plaintiffs' standard of care expert, Robert Fraisse, testified there should have been an independent investigation of the 2011 email, also citing collegiality.

When Plaintiffs called Kraszewski, the trial court ruled they could ask about meals and going to each other's houses, but could not ask if Chatham and Torres had a "special relationship," explaining it "would be speculation, but more important is that [Torres] would not be here . . . ." Plaintiffs asked Kraszewski if she, Chatham, and Torres ever socialized together outside of school, and she responded "[n]ot very often, but yes." She described the time that Torres invited her and Chatham for dinner, and said this was "more to see" Chatham's new apartment and they went to Torres's house for dinner afterwards.

During closing arguments, Plaintiffs' counsel argued Chatham should have been reported for District investigation; cited Sonnich, Fraisse, and Kraszewski's testimony; and asserted Kraszewski said "Torres wanted to be [Chatham's] friend" and "[t]hat can cloud . . . judgment."

51

b.      *Analysis*

Plaintiffs do not establish any abuse of discretion.  The trial court carefully and repeatedly considered whether to permit evidence about Chatham and Torres's friendship, and ruled Plaintiffs could elicit certain testimony from Kraszewski (which they did) and Chatham (which they did not do).  The court's decision to preclude Plaintiffs from having Kraszewski speculate about the nature of the relationship was sound, and Plaintiffs do not show they made any further effort to introduce the Facebook messages after the motion in limine hearing.

Plaintiffs argue they sought the relationship evidence to "explain the lack of adequate response" by school administrators to the 2011 email report about Chatham.  In other words, they aimed to suggest Torres handled the issue herself, rather than reporting it for District investigation, due to favoritism.  But Torres was deceased, and the only deponent who even potentially suggested she favored Chatham was teacher Nelson—who said Chatham had Torres's ear in situations *relating to Nelson*.  The trial court could reasonably limit such speculation about Torres's motives.  (*People v. Babbitt* (1988) 45 Cal.3d 660, 682 [" 'The inference which defendant sought to have drawn . . . is clearly speculative, and evidence which produces only *speculative* inferences is *irrelevant* evidence.' "].)  Plaintiffs were still able to elicit objective facts—Torres did not report Chatham for District investigation, and did visit his apartment and had dinner with him—and to use this evidence in closing arguments to contend her judgment could have been clouded by her desire to be friends with Chatham.

Plaintiffs also do not establish they were prejudiced by the limitation on the friendship evidence.  They contend it "very reasonably accounts for the low allocation of only 40% fault to the District," and was especially prejudicial

because the District was able to emphasize Torres's concern for student safety and accolades received by her and the school. These contentions lack merit. It was undisputed that Torres did not report Chatham for investigation, and Plaintiffs already showed she spent time with Chatham outside of school and argued her judgment was clouded as to him. Plaintiffs do not show that additional evidence about Torres and Chatham's relationship would have materially enhanced that showing, or impacted the fault allocation at all.

### 3. *Internet Bookmarks*

#### a. *Additional Facts*

A laboratory ran a forensic search on Chatham's District laptop, and San Diego Police Detective V. received a screenshot of his website bookmarks. The screenshot included around 15 pornographic bookmarks, including multiple sites with the terms "teen" and/or "boy."

When Plaintiffs' counsel examined Detective V. about the bookmarks, the District objected on various grounds, and the trial court addressed the scope of the testimony. The court asked Plaintiffs' counsel if he wanted "all this in," and counsel said, "[A] sampling . . . is fine. I don't need to have every site." Counsel explained that if the District had done the "investigation [they] . . . should have done," it likely would have obtained Chatham's computer to see what was going on. The court stated it had an Evidence Code section 352 concern about the term "boy," explaining "If we start getting into child porn . . . . Ballgame over." The court asked Plaintiffs' counsel to identify sites and avoid the term "boy"; counsel suggested "Gay Teen Love," "Welcome to Free Gay Pictures," Pornhost.com, and a site with 9,000 free gay photos, and also agreed to the trial court's suggestion of "Gay Hotel in Amsterdam." Detective V. resumed testifying, and Plaintiffs' counsel said,

53

"We're not going to go through everything . . . . Just tell us a . . . few of the bookmarked sites on there." Detective V. identified the five sites discussed by counsel and the court.

Both psychiatric experts addressed grooming (an issue on which Plaintiffs believe the bookmark evidence is relevant, as we discuss *post*). Dr. Colarusso defined grooming as an attempt to gain confidence, so one can sexually abuse a child. He said that this was a "situation of group grooming" in front of other teenagers. Dr. Addario said grooming involves a perpetrator "singling out one person" for "special treatment," and he had not had a case involving group grooming. Sonnich, former head of human resources, also testified about grooming, and said the "literature on this is that grooming is an individual with an individual."

Fraisse, Plaintiffs' standard of care expert, testified that if the District found pornography on Chatham's computer in 2010 or 2011, it "would have been a reason for termination." During closing arguments, Plaintiffs noted the pornographic bookmarks, including "Gay Teen Love," contended that they would have been discovered if an investigation was conducted in 2011, and argued there was group grooming.

>        b.    *Analysis*

Plaintiffs argue the trial court erroneously "refused to allow the document showing the pornographic websites." We reject this argument.

As a preliminary matter, it is not clear Plaintiffs objected to the trial court's treatment of the bookmarks. Their counsel told the trial court a "sampling" was adequate and identified bookmarks at the court's request that did not include the word "boy." On appeal, Plaintiffs indicate Exhibit 35 had the full bookmark list and the court excluded it, but the record pages they cite do not address an Exhibit 35. (See *Shaw v. County of Santa Cruz*

(2008) 170 Cal.App.4th 229, 282 [appellants "fail to point to any place in the record where they successfully preserved" claim for "erroneous exclusion of evidence," precluding consideration on appeal].)[17]

Even if Plaintiffs preserved their argument, they do not establish any abuse of discretion. Under Evidence Code section 352, a trial court "may exclude evidence if its probative value is substantially outweighed by the probability" that it will "create substantial danger of undue prejudice," among other grounds. The court reasonably excluded bookmarks containing the word "boy," because it implicates child pornography and could unduly prejudice the jury. (Cf. *People v. Holford* (2012) 203 Cal.App.4th 155, 171 ["[C]hild pornography is not pretty and will always be unpleasant. Trial courts must be afforded equally broad discretion in ruling on [Evid. Code, §] 352 objections in this context"].) The court could also impliedly find that supplemental testimony (e.g. that Chatham was not charged with child pornography) would not mitigate this risk. The court still permitted Plaintiffs to identify multiple sites for Detective V's testimony, including "Gay Teen Love," which reflected Chatham's sexual interest in young men.

Plaintiffs do not establish otherwise. First, they argue the "presence of so many of these websites as bookmarks" shows the District failed to monitor Chatham's computer after the 2011 email, and their discovery at the time would have triggered termination. But there is no dispute the District did not review his computer before 2014, any pornographic bookmarks would suffice to illustrate that, and Plaintiffs were able to elicit testimony about five of them (and note this was not "everything").

_____

17    The exhibit lodgment in the record on appeal contains the bookmark list and identifies it as a nonadmitted page in Exhibit 2 (the police report), but Plaintiffs do not identify any ruling in that regard, either.

Second, Plaintiffs argue that limiting the bookmark evidence bolstered the District's purported positions that Chatham's conduct was not grooming, but rather "unprofessional behavior," and that Plaintiffs participated in some of Chatham's conduct. Even setting aside Plaintiffs' dubious characterization of the District's positions, their point lacks merit. If Plaintiffs felt that showing Chatham had sexual interest in young males was necessary to show he engaged in group grooming and preyed on Plaintiffs (and to dispute contrary arguments by the District), that still does not mean they needed the full list of bookmarks to do so. We also reject Plaintiffs' claim that the inclusion of a gay travel site rendered the evidence "a non sequitur that Chatham was gay." Their counsel agreed to include this site and regardless, the "Gay Teen Love" site was evidence that Chatham was interested in young men specifically.

Finally, Plaintiffs do not establish prejudice. They contend the limitation of the bookmark evidence "had a reasonable likelihood of lowering the jury's allocation of fault to the District." We do not see how. Plaintiffs were able to have Detective V. testify about five bookmarks, including "Gay Teen Love," and during closing arguments, they referenced that testimony and were able to address the issues they focus on here (e.g., Chatham would have been terminated if the bookmarks had been discovered; grooming can occur on a group basis). Plaintiffs do not establish that having all 15 bookmarks before the jury, instead of five, would have made any difference.

4. *H.R.'s Treating Psychologist*

a. *Additional Facts*

Trial initially was set for February 2018, and expert depositions were completed the previous month.

56

In April or May 2018, H.R. began seeing Dr. Morgan Shaw, a treating psychologist at Kaiser Permanente. In mid-May 2018, Plaintiffs sent the District a "Supplemental Designation of Expert Witnesses" that listed Dr. Shaw as one of H.R.'s "percipient treating physicians who may be asked opinion testimony." The transmittal email indicated they would forward Dr. Shaw's records. The District's counsel responded, stating the District objected; discovery was closed; and this would prejudice the District and require further discovery.

In late May 2018, the trial court issued an order continuing the trial to October 2018 and stating, "[n]o further discovery."

In September 2018, Plaintiffs unsuccessfully moved to augment their expert witness designation; only the denial order is in the record.

The District moved in limine to bar Plaintiffs from offering testimony from Dr. Shaw. The District contended it had been unable to depose her, and its experts were unable to review the medical records. Plaintiffs opposed the motion, arguing in part that although the court previously denied their motion to "designate Dr. Shaw as a non-retained expert," the current question was "whether [she] should be allowed to testify as a percipient witness." They also argued the District "refused to take [her] deposition . . . when it was offered on multiple occasions." The counsel declaration they cited in support of their opposition does not appear to be in the record. At the hearing, the trial court ruled H.R. could testify Dr. Shaw treated him, but she could not testify. When the District's counsel asked for clarification that H.R. was the only one who could testify, the court said his mother could "say [she] took him to treatment" and confirmed Plaintiffs' expert psychiatrist, Dr. Colarusso, could not change or supplement his opinion.

Mid-trial, the court expressed concern about the speed of proceedings and asked, "Is Dr. Shaw going to be called?" The record does not reflect any response by counsel.

While conducting H.R.'s direct examination, Plaintiffs' counsel asked about counseling he received in high school and in 2015. He said he attended five to seven sessions his sophomore year due to family issues and another five to seven his junior year after his grades slipped, and that the latter sessions "did help somewhat." He said he sought out counseling at Kaiser again in 2015 because he was having "tough mental times" and the Chatham events were "get[ting] to" him. Plaintiffs' counsel did not ask about 2018 or Dr. Shaw. They also examined H.R.'s parents about his counseling sessions, and also did not ask about 2018 or Dr. Shaw.

During cross examination, the District's counsel asked H.R. if he recalled the names of health care providers between October 2015 and April 2018. He named Dr. Shaw. Counsel asked, "[W]hen did you first start to see Ms. Shaw?" and H.R. said, "sometime around the beginning of this year," confirming he meant 2018. H.R. acknowledged he saw the counselor in 2015 the day before his deposition. On redirect, Plaintiffs' counsel asked H.R. how long he had seen Dr. Shaw, and he said, "probably [up until the] beginning of September."

The District's expert, Dr. Addario, testified H.R. had a history of noncompliance with treatment, and opined the "chances are fair to guarded if he'll follow through with treatment." He further testified, as to all Plaintiffs, that he did not know if he could "accept that we have three people who don't go to any treatment, yet they're having all these problems." As noted, Plaintiffs' expert, Dr. Colarusso, believed all three Plaintiffs needed years of therapy.

In closing arguments, Plaintiffs' counsel noted H.R. had "been seeing Dr. Shaw since early 2018," and argued the "therapy with Dr. Shaw ha[d] helped [H.R.] a lot," and he "hop[ed] . . . to get better mentally." The District's counsel argued the jury should consider the lack of counseling in evaluating the damages evidence. For H.R., counsel argued he "rarely went to counseling," went after his lawsuit only before the deposition, and was not going now, and said, "So will he go in the future? We don't know. We can judge past conduct. We know what he's done so far."

  b. *Analysis*

Plaintiffs do not show the trial court abused its discretion. After unsuccessfully trying to add Dr. Shaw to their expert witness designation, they opposed the District's motion to exclude her, in part because she could still testify as a percipient witness. Put differently, she could testify about the treatment H.R. received. The trial court could reasonably conclude this topic could be addressed by having H.R. testify about his treatment, which avoided having a witness who was identified after discovery closed (whether the delay was justified or not). It was Plaintiffs who then chose to address the topic in only a limited manner. They did not ask H.R. about Dr. Shaw until redirect examination, and then asked only when counseling ended—not how many sessions he attended or whether they were helpful, testimony they elicited about other counseling sessions. They also did not ask if he planned to resume treatment in the future. And there is no indication they renewed their request to have Dr. Shaw testify, even after the trial court asked mid-trial if she would be testifying.

Plaintiffs' arguments lack merit. They contend they offered Dr. Shaw for deposition and, because the District did not take it, the District was able to suggest H.R. was malingering or unlikely to seek treatment. Plaintiffs'

appendix omits the attorney declaration that purportedly shows the deposition offers were made. (*County of Sacramento v. Rawat* (2021) 65 Cal.App.5th 858, 861 [" '[W]e may disregard factual contentions . . . based on information that is outside the record.' "].) In any event, we assume that to the extent Plaintiffs described discovery proceedings for the trial court, the court considered them while ruling on the motion in limine, and it could still reasonably conclude that having H.R. testify, not Dr. Shaw, was the fair resolution. (Evid. Code, § 664 ["It is presumed that official duty has been regularly performed."].)

Plaintiffs do not establish prejudice, either. They contend that Dr. Shaw's testimony was necessary, and H.R.'s damages were unjustifiably low as a result of its exclusion. We are not persuaded. Plaintiffs still presented evidence that H.R. received counseling multiple times in the past (from H.R. and his family), and would benefit from *years* of counseling in the future (from Plaintiffs' psychiatric expert, Dr. Colarusso). That showing was not rendered moot simply because the District offered expert testimony and argument that questioned if H.R. would seek treatment. We also reject Plaintiffs' assertion that "[t]he key piece of rebuttal evidence" for H.R. was "his 10 visits to Dr. Shaw in April and May of 2018, documented in Exhibit 127 [Dr. Shaw's treating notes]." H.R. told the jury he saw Dr. Shaw from the "beginning" of 2018 through September 2018, and Plaintiffs cited the "early 2018" timeframe in closing arguments, permitting the jury to infer a long treatment period and potentially many visits. The treating notes would

have shown he saw her for around six weeks, and a limited number of times.[18]

5.  *M.L.'s College Football Coach*

    a.  *Additional Facts*

M.L. played football during his second year at Grossmont Community College.  During a transcribed interview with Dr. Addario in 2017, M.L. told him, "I played one full year of football. . . .  I did pretty good in school because I was playing football all year long."

In opening statements, Plaintiffs' counsel told the jury that at the end of M.L.'s college football season, "with Division 1 scouts there, and having the best game of his . . . career[,] he just walked off the field."

M.L. testified he did not get into a Division 1 or 2 program, because he did not have the grades, and everything he worked for was "washed [away], gone, pointless."  He enrolled at Grossmont to play football and try to transfer to another program.  He did not play his first year due to an injury, and said "it started to get a little more rough," as he "lost [his] outlet."  During his second year, the "love of the sport" was leaving him.  He said his last game was week eight; it was his "best game . . . all year," with scouts in the stands; and he "walked off," "[d]idn't finish the season," and "[didn't] know why."  On cross-examination, the District's counsel asked if M.L. told Dr. Addario he played "all year," and M.L. recalled saying he played "that football year." After counsel read the interview transcript, M.L. acknowledged he told Dr. Addario, "I played the year."  On redirect, M.L. confirmed he walked off

---

18    Proposed Exhibit 127, which the parties lodged here, reflects five visits, and two "no show[s]."  A summary invoice has 10 entries, with five entries for the visits and five entries for payment dates.

the field with "about two" games left, it was his "last game," and he "[didn't] know what happened."

M.L.'s father testified M.L. had a "couple of really amazing" college football games, but the "last two games of the season he didn't even show up for his own games."

Dr. Colarusso opined M.L.'s "self-esteem was built around his reputation as a football player," he had been "outed . . . having had homosexual experiences with a teacher," and feared the "publicity related to sports." He said that despite M.L. initially excelling at football after the Chatham events, that did not continue into junior college, noting he walked off the field and did not finish the year. On cross-examination, he acknowledged the walk-off incident was not in his notes, but recalled the information came from M.L. Dr. Colarusso also testified, "We talked some about his struggle with grades in high school. He said, quote, I lost everything, meaning, self-esteem, his life, his football career. Quote, I was depressed. No one would understand. He didn't open up to his parents. He felt like less of a man."

Plaintiffs' counsel asked to call M.L.'s college football coach. The trial court said, "Don't call the football coach. It's not the main issue." Counsel asked if he could call him as a rebuttal witness, and the court stated, "You can always . . . if it's appropriate, call somebody on rebuttal." After the District's case, the court said the coach was "out," but let Plaintiffs' counsel make an offer of proof. Counsel argued the District made Plaintiffs' "credibility . . . a major issue" and cross-examined M.L. on his statement to Dr. Addario; there was "jury appeal" in that M.L. "walked off the field and never went back to his sport, his passion"; and the coach "can corroborate that." The court ruled the football coach could not testify.

During closing arguments, Plaintiffs' counsel reiterated M.L. walked off the field. The District's counsel argued there was no "credible evidence to that effect," citing the interview with Dr. Addario. Counsel further argued, "The football career [M.L.] thought he was going to have . . . did not happen . . . when he went to junior college" and "that's what shattered" him.

       b.    *Analysis*

Even if the football coach were a proper rebuttal witness (which the District disputes), Plaintiffs do not establish they were prejudiced by his exclusion. They argue, in substance, that the District questioned whether M.L. left football because of Chatham's abuse, in order to call his credibility into question and reduce the jury's damage award, and the coach's exclusion led to reduced damages. These arguments lack merit.

There was no dispute M.L. was a promising high school football player, who left the sport after playing during one college season. But whether he left the sport because of Chatham, and the circumstances under which he left, are different issues. Plaintiffs do not establish the coach had any insight as to the potentially significant issue: *why* he left football. Rather, the coach could testify only about the comparatively minor detail of *when and how* M.L. left the team. And there was already evidence before the jury on that issue. Both M.L. and his father testified he did not finish the season; M.L. described walking off the field; and he confirmed doing so, even after hearing the interview transcript with Dr. Addario. Plaintiffs do not establish additional testimony from the coach on this minor factual issue could have increased the damage award. (Cf. *Cassim*, *supra*, 33 Cal.4th at p. 800 [must be "more than an abstract possibility"].)

Plaintiffs' focus on the District's arguments is unavailing. To the extent the District contended in closing arguments that M.L. left football for

63

reasons other than Chatham, this was supported by evidence unrelated to any testimony the coach could provide. Although Dr. Colarusso suggested M.L.'s departure from football was related to Chatham, he also noted M.L. addressed his struggle with his grades. M.L. himself said that when he did not get into a top football program due to his grades, he felt like everything he worked for was "pointless." And M.L. stated he "didn't know" why he left the field. Although the District did argue there was no credible evidence M.L. left the field mid-game—an issue on which the coach could have testified—Plaintiffs do not show that would have impacted damages, for the reasons discussed above.

E. *Plaintiffs Do Not Establish Instructional Error*

Finally, Plaintiffs argue the trial court prejudicially limited damages, by erroneously listing them in the oral CACI 406 instruction regarding apportionment of fault. We conclude any error was harmless.

1. *Additional Facts*

The trial court and counsel addressed the verdict form and the CACI 406 jury instruction, which addresses fault apportionment among joint tortfeasors. The District sought to include additional individuals on the verdict form, including H.R.'s father, which Plaintiffs opposed. The court ruled only the District and Chatham would be on the form, stating it "relies on what joint tortfeasors are . . . ."

While giving the jury instructions, the trial court explained Plaintiffs claimed the District negligently retained and supervised Chatham, resulting in harm to them, and the District denied these claims. The court subsequently instructed the jury with a modified version of CACI 406 and erroneously included the term "plaintiffs" (italics added):

"[The District] claims . . . [Chatham] also contributed to Plaintiffs' harm. To succeed on this claim, [the District]

64

must prove both of the following: [¶] 1, that [Chatham] was at fault; and [¶] 2, that the fault of [Chatham] was a substantial factor in causing Plaintiffs' harm. [¶] If you find that the fault of more than one person, including *Plaintiffs*, [the District], and [Chatham], was a substantial factor in causing Plaintiffs' harm you must decide how much responsibility each has by assigning percentages of responsibility to each person listed on the verdict form. The percentages must total 100. [¶] You will make a separate finding of plaintiffs' total damages, if any. In determining the amount of damages, you should not consider any person's assigned percentage of responsibility. [¶] 'Person' can also mean an individual or a business entity."

The oral instruction matched the written jury instructions submitted before trial. The court also instructed the jury under CACI 3900 to award damages "caused by [the District's] wrongful conduct."

While addressing apportionment in closing arguments, the District's counsel argued as to H.R., "Don't let [Chatham] get away. . . . He's 100 percent at fault. . . . 99 percent, 98 percent. Definitely the vast majority of fault." For M.L., he said "don't let [Chatham] get away" and that Chatham was at fault a "hundred percent, 99 percent." And, for K.M., he said, "[W]hen you apportion fault, it's [Chatham]."

After closing arguments, the trial court gave further instructions. The court stated "[m]ost . . . instructions are typed," but handwritten words might be added, and the jurors should "treat all the words the same" and "[s]imply accept the instructions in [their] final form." The court also stated, "I will give you verdict forms with answers you must follow." The final written jury instructions are not in the record. The verdict form is not in the record either, but the judgment memorialized the verdict and reflects apportionment to Chatham (60 percent) and the District (40 percent).

65

Plaintiffs moved for a new trial based in part on instructional error regarding CACI 406, which the trial court denied. The court found it was wrong to include plaintiffs in CACI 406, but this did not "infect[ ] the whole . . . verdict." The court further stated, "Clearly, there was no comparative negligen[ce] . . . instruction. Clearly, the verdict form put it just between [Chatham] and the [District]."

2.      *Applicable Law*

"Instructional error in a civil case is not ground for reversal unless it is probable the error prejudicially affected the verdict." (*Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 359 (*Red Mountain*); accord, *Soule, supra*, 8 Cal.4th at p. 580; *Soule*, at pp. 580-581 [factors for consideration include the state of the evidence, the effect of other instructions and counsel's arguments, and any indications by the jury it was misled].) "We independently review claims of instructional error viewing the evidence in the light most favorable to the appellant." (*Orichian v. BMW of North America, LLC* (2014) 226 Cal.App.4th 1322, 1333.)

3.      *Analysis*

Plaintiffs do not establish they were prejudiced by the trial court's inclusion of the term "plaintiffs" in the oral CACI 406 instruction.

As an initial matter, Plaintiffs do not show the jury relied on the oral instruction. "We presume that jurors are intelligent and capable of correctly understanding, correlating, applying, and following the court's instructions." (*People v. Acosta* (2014) 226 Cal.App.4th 108, 119 (*Acosta*).) " 'This presumption includes the written instructions.' " (*People v. Mills* (2010) 48 Cal.4th 158, 200-201 (*Mills*).) "[A]s long as the court provides the jury with the written instructions to take into the deliberation room, they govern in any conflict with those delivered orally." (*People v. Osband* (1996) 13 Cal.4th

622, 717; see *People v. Mungia* (2008) 44 Cal.4th 1101, 1132 ["[W]hen erroneous oral instructions are supplemented by correct written ones, we assume the jury followed the written instructions, particularly when, as here, the jury is instructed that the written version is controlling."].)

Plaintiffs concede the final written instructions presumptively were correct, but argue we should not assume the jury followed them. They state the "presumption of regularity applies where the jury is instructed that the written instructions *control*," usually with CALJIC 17.45; other cases involved minor errors; and the error here was "far from trivial . . . ."[19] The District maintains the trial court did indicate the written instructions controlled, by telling the jury to "[s]imply accept the instructions in [their] final form"; Plaintiffs disagree this was adequate. We need not resolve that disagreement, because the error was trivial, as we explain next in concluding there was no prejudice.

The rest of the instructions, the verdict form, and closing arguments all made clear to the jury that fault should be assigned between Chatham and the District. (See *Soule*, *supra*, 8 Cal.4th at pp. 580-581.) The rest of CACI 406 told the jury the District claimed *Chatham* also contributed to their harm—not Plaintiffs themselves; to "assign[ ] percentages of responsibility to each person listed on the verdict form"; and that the "percentages must total 100." The jury was also told they would be given "verdict forms with answers [they] must follow." Chatham and the District presumably were the only persons on the verdict form. During closing arguments, the District's counsel argued Chatham was 100 percent at fault (or close), and the jury should not

19    CALJIC 17.45 states in pertinent part, "You are to be governed only by the instruction in its final wording."

let Chatham "get away" with it.  Counsel never stated Plaintiffs were *any* percent at fault.

On this record, it would have been unreasonable for the jurors to view the word "plaintiffs" in CACI 406 as anything besides a trivial misstatement and we will not assume they did.  (*Acosta*, *supra*, 226 Cal.App.4th at p. 119; cf. *Mills*, *supra*, 48 Cal.4th at p. 200 ["verdicts are not undermined by the mere fact the trial court misspoke"].)  There is also nothing to suggest the jury was confused.  The jury's assigned fault percentages, 60 percent to Chatham and 40 percent to the District, added up to 100 percent, as instructed.  Plaintiffs also do not show the jury asked any questions during deliberations.  Accordingly, Plaintiffs do not establish they would have obtained a larger apportionment to the District or higher damage award, absent the error, and we will not reverse.  (*Red Mountain*, *supra*, 143 Cal.App.4th at p. 359.)

Plaintiffs' arguments do not compel a different result.

First, they argue that because the trial court gave the CACI 3900 instruction to award damages "caused by [the District's] wrongful conduct," the jury "reduced ahead of time . . . damages . . . not caused" by the District and "being told to apportion fault to Plaintiffs . . . would result in a double deduction to Plaintiffs."  The trial court gave CACI 406 *before* CACI 3900; mistakenly permitted, but did not require, apportionment of fault to Plaintiffs; and expressly told the jury it would determine damages "separately" and "should not consider" assigned responsibility.  We must assume the jury followed the instructions, not misunderstood or disregarded them.  (*Acosta*, *supra*, 226 Cal.App.4th at p. 119.)

Second, Plaintiffs argue the District's trial strategy was to blame them for "their participation [in] and failure to report" Chatham's conduct, citing

68

evidence and argument that they did not fear him and viewed his conduct as a joke, did not report it at the time, and did not pursue counseling. Plaintiffs then argue the oral CACI 406 instruction "likely resulted in one of three scenarios": the jury could have handwritten a percentage of fault for Plaintiffs on the verdict form, which they concede did not happen; they could have "assigned Plaintiffs a certain percentage of fault and . . . attributed it to Chatham"; or they could have "reduced the overall damages already limited to [District's] misconduct by what they considered to be Plaintiffs' individual fault." Plaintiffs assert the latter two are reasonably probable, so they have shown prejudice. Not so. We already rejected a discount as inconsistent with the jury instructions. Plaintiffs' claim that the jury could assign fault to Plaintiffs, but attribute it to Chatham, is both contrary to the instructions and implausible. Ultimately, Plaintiffs disregard the likely scenario, that *is* consistent with the instructions: the jury ignored the misstatement and assigned fault and awarded damages based on their view of the District's culpability.[20]

## II. *The District's Appeal From The Costs Orders*

The District argues the trial court's orders on costs should be reversed, because the court erroneously ruled its section 998 offers were invalid. This argument lacks merit.

### A. *Additional Facts*

The District made the operative section 998 offer to each Plaintiff in May 2018. The District offered $320,000 to H.R., $170,000 to K.M., and $110,000 to M.L. Pertinent here, each offer included the following language:

---

[20] Because Plaintiffs do not establish prejudicial error, we do not reach the District's further argument that Plaintiffs invited error by, inter alia, not objecting to the oral instruction at the time.

> "Plaintiff . . . agrees that all parties will bear their own costs and fees, and the parties will execute a settlement and release providing that Plaintiff will satisfy all liens, execute a Civil Code section 1542 waiver, and there will be no admission of liability by [the District]."[21]

No settlement agreement or release agreement was attached to the offers. Plaintiffs did not accept the offers.

As noted, the judgment required the District to pay $240,000 to H.R., $60,000 to K.M., and $69,000 to M.L. For each Plaintiff, the District's section 998 offer exceeded the amount owed.

The District filed costs memoranda, and moved to strike Plaintiffs' costs based in part on the section 998 offers. Plaintiffs moved to tax the District's costs, and opposed the motion to strike their costs, arguing the section 998 offers were invalid.

The trial court granted Plaintiffs' motions to tax costs, stating the District "failed to meet its burden to show the . . . section 998 offers were valid," and citing *Ignacio v. Caracciolo* (2016) 2 Cal.App.5th 81 (*Ignacio*) and *Sanford v. Rasnick* (2016) 246 Cal.App.4th 1121 (*Sanford*). The court granted the District's motions to tax Plaintiffs' costs in part, and on grounds other than section 998. During the hearing, the court explained the offers were "invalid because of the additional terms[,] in trying to value the additional terms."

---

21     Civil Code section 1542 states: "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

B.    *Applicable Law*

Section 998 "establishes a procedure for shifting the costs upon a party's refusal to settle. If the party who prevailed at trial obtained a judgment less favorable than a pretrial settlement offer submitted by the other party, then the prevailing party may not recover its own postoffer costs and, moreover, must pay its opponent's postoffer costs, including, potentially, expert witness costs." (*Ignacio, supra*, 2 Cal.App.5th at p. 86; see *Elite Show Services, Inc. v. Staffpro, Inc.* (2004) 119 Cal.App.4th 263, 268 (*Staffpro*) [purpose of § 998 is to "encourage . . . settlement . . . , by punishing the party who fails to accept a reasonable settlement offer from its opponent"].)

"The burden is on the offering party to demonstrate that the offer is valid under section 998." (*Ignacio, supra*, 2 Cal.App.5th at p. 86.) Whether a section 998 offer is "sufficiently certain to be enforceable involves a question of law . . . ." (*Staffpro, supra*, 119 Cal.App.4th at p. 268; *Berg v. Darden* (2004) 120 Cal.App.4th 721, 727, 731 (*Berg*) [no " 'magic language' " is necessary, but "offer must be sufficiently specific to permit the recipient meaningfully to evaluate it"].) "We independently review whether a section 998 settlement offer was valid." (*Ignacio*, at p. 86; *Staffpro*, at p. 268 [review is de novo].)

C.    *Analysis*

Each section 998 offer required the parties to "execute a settlement and release providing that Plaintiff will satisfy all liens, execute a Civil Code section 1542 waiver, and there will be no admission of liability," but did not attach a settlement and release agreement. Plaintiffs argue all three terms rendered the offers invalid, which the District disputes. We conclude that requiring execution of a settlement and release agreement, without attaching

71

it or at least providing detailed terms, rendered the offers invalid, and do not reach the other arguments advanced by the parties.

*Sanford*, cited by the trial court, is instructive. (*Sanford*, *supra*, 246 Cal.App.4th at pp. 1123-1124.) Defendants in a motorcycle accident case made a section 998 offer that required "execution and transmittal of a written settlement agreement and general release," but neither the offer, nor counsel communications, disclosed the agreement's terms. After losing at trial, they successfully moved to tax the plaintiffs' costs, and the Court of Appeal reversed. (*Id.* at pp. 1125, 1127-1128, 1130.) The court stated, "The case law does allow for releases. [Citations.] [¶] But a release is not a settlement agreement, and the [defendants] have cited no case, and we have found none, holding that a valid . . . 998 offer can include a settlement agreement, let alone one undescribed and unexplained." (*Id.* at p. 1130.) The court elaborated:

> "[T]he terms of a settlement agreement can be the subject of much negotiation. And the terms can be problematical. For example, settlement agreements typically contain a waiver of all claims 'known and unknown,' a provision that has been held to invalidate a . . . 998 offer.' [Citations.] [¶] . . . [¶] [A]nd as every lawyer who has settled a case will appreciate, the issue as to . . . section 1542 in a release can be the subject of much discussion." (*Sanford*, *supra*, 246 Cal.App.4th at p. 1131.)

The court agreed with the plaintiff that because the agreement was "not described or revealed," he was " 'left to guess at what terms [the offerors] might insist upon . . . .' " (*Sanford*, *supra*, 246 Cal.App.4th at p. 1131; *id.* at p. 1132 [" 'Disputes would erupt and become routine over what offerors can and cannot place into these jack-in-the-box settlement agreements hidden in their section 998 offers.' "].)

The District's section 998 offers are invalid for the same reasons as in *Sanford*. They required the Plaintiffs to execute a settlement agreement and release, but did not attach the written agreement or describe the terms in any meaningful detail. This left Plaintiffs "to guess at what terms" the District might require. (*Sanford*, *supra*, 246 Cal.App.4th at p. 1131; compare *Auburn Woods I Homeowners Assn. v. State Farm General Ins. Co.* (2020) 56 Cal.App.5th 717, 727 (*Auburn*) ["Unlike in the *Sanford* case, here the proposed settlement agreement was attached to [defendants'] section 998 offer, and thus [the plaintiffs were] not required to guess about the terms and conditions."].) Plaintiffs identify potential terms like tax treatment and non-disparagement. The District's response—that "the terms are right there" and "[t]here is nothing to add"—is not compelling. If there was nothing to add, there was no need to require "execution of a settlement and release."

Nor, as the District claims, is this deficiency mitigated by the offers' broad description of three terms (i.e., lien satisfaction and Civil Code section 1542 waiver by Plaintiffs, nonadmission of liability by the District). As the *Sanford* court observed, settlement agreement terms "can be the subject of much negotiation"—including terms regarding liens and Civil Code section 1542. (*Sanford*, *supra*, 246 Cal.App.4th at p. 1131 [settlement agreement terms "can, and frequently do, implicate the protection of lienholders"]; *ibid*. ["the issue as to . . . [Civ. Code, §] 1542 in a release can be the subject of much discussion"].) The District maintains a section 998 offer can require satisfaction of liens, citing *Toste v. CalPortland Construction* (2016) 245 Cal.App.4th 362, 374. But that is not what the District's offers do. Rather, they require a *settlement that addresses* liens, which can involve issues warranting further negotiations (e.g. lien treatment after default). *Toste* did not involve a settlement agreement, and *Sanford* confirms that once an

73

agreement is required, the details of issues like liens must be addressed. That the *Sanford* offer did not address liens at all does not render its point inapplicable, as the District contends. (*Sanford*, at p. 1125.)[22]

The District belatedly offers two more points on reply, which also lack merit. First, it argues an "offeree may seek clarification or negotiate the terms of an unclear section 998 offer," citing *Berg*, *supra*, 120 Cal.App.4th 721. (*Id.* at pp. 730-731 [determining § 998 offer was sufficiently specific, but noting that if offeree is "uncertain about some aspect of the offer," he is "free to explore those matters with the offeror, or even to make counterproposals"].) That an offeree has these options does not absolve an offeror from providing a clear, valid offer. Second, the District argues the offers "did not require 'execution and transmittal of a written settlement agreement' as . . . in *Sanford*," but rather "sought execution of a 'settlement and release.' " In this context, "execute" reasonably implies a written document. (See Black's Law. Dict., 11th ed. [definitions of "execute" include "[t]o make (a legal document) valid by signing"].) Accordingly, the District's combined respondent's brief and cross-appellant's opening brief repeatedly characterized the offer as "requir[ing] . . . a settlement agreement," in one instance calling it an "expected settlement agreement." The District offers no

---

22     Although we need not address whether the Civil Code section 1542 waiver separately renders the Code of Civil Procedure section 998 offer invalid, we note that in cases cited by the District on the issue, the offeror provided a settlement agreement that included the Civil Code section 1542 waiver, mitigating concerns about its scope. (See *Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 765 ["proposed agreement . . . included a waiver of the provisions of Civil Code [§] 1542"]; *Auburn*, *supra*, 56 Cal.App.5th at p. 726 [Civ. Code, § 1542 waiver in proposed settlement agreement was limited to "any and all claims for damages related to the subject of the ACTION"].)

74

reasonable explanation on reply for what else "execution of a settlement and release" could mean.

DISPOSITION

The judgment and order are affirmed. The District shall be awarded its costs with respect to Plaintiffs' appeal. Plaintiffs shall be awarded their costs with respect to the District's appeal.

HUFFMAN, Acting P. J.

WE CONCUR:

O'ROURKE, J.

BUCHANAN, J.

75